ROBERTS, J.,
 

 for the court.
 

 ¶ 1. A jury sitting before the Simpson County Circuit Court found Rubin Ren-frow guilty of one count of possession of child pornography. The circuit court sentenced Renfrow to fifteen years in the custody of the Mississippi Department of Corrections (MDOC). Aggrieved, Ren-frow appeals. Renfrow claims the circuit court erred when it: (1) denied his motions to suppress the evidence that was obtained from his computer, (2) denied his motion to suppress the evidence related to his interview at the Simpson County Sheriffs Department, (3) denied his motion to dismiss the indictment on the basis that Mississippi Code Annotated section 97-5-33(5) (Supp.2008) is impermissibly vague, (4) denied his motion for a continuance intended to give his attorney more time to review a forensic duplicate of his hard drive and his original hard drive, (5) denied his motion for a judgment notwithstanding the verdict (JNOV), and (6) denied his motion for a new trial. Finding no error, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. The catalyst that led to Renfrew's conviction occurred in March 2006, when a child related to Renfrow spoke to an elementary school counselor. It is unclear what the child said to the school counselor, but whatever the child said, the school counselor was concerned that the child had been exposed to inappropriate matters of a sexual nature. The school counselor relayed his concerns to the child’s father and Kim Fulgram with the Rankin County Department of Human Services. Fulgram contacted Brian Ervin, a counselor with the Rankin County Child Advocacy Center. On March 8, 2006, Ervin interviewed the child who spoke to the school counsel- or. Ervin also interviewed the child’s sib
 
 *622
 
 ling. The children, then ages four and six years old, indicated that Renfrow showed them pictures that he had on his computer.
 
 [1]
 
 To paraphrase the children, Renfrow showed them pictures of naked adults and children. The inference was that Renfrow had showed the children pictures of adult and child pornography. The children also allegedly indicated that Renfrow had touched them inappropriately.
 
 [2]
 

 ¶ 3. Because the events described by the children were to have taken place in Simpson County, Fulgram contacted the Simpson County Sheriffs Department. On March 16, 2006, the children’s father met with Investigator Bernard Gunter of the Simpson County Sheriffs Department. Investigator Gunter also watched the videotape of Erwin’s interviews of the children. On March 21, 2006, Investigator Gunter applied for and obtained warrants to arrest Renfrow and to search Renfrow’s home and seize his computer. That same day, Investigator Gunter executed the warrants. Investigator Gunter went to Renfrow’s home in Simpson County, arrested Renfrow, and seized Renfrow’s computer. Investigator Gunter delivered Renfrow’s computer to the Mississippi Attorney General’s Cyber Crime Unit (the Cyber Crime Center), where forensic investigators Sherita Sullivan and Keith Leavitt examined Renfrow’s computer. Their examinations will be discussed in greater detail below. Succinctly stated, the investigation of Renfrow’s computer involved creating a forensic duplicate of Renfrow’s hard drive and then examining the forensic duplicate.
 

 ¶ 4. Meanwhile, Renfrow had been arrested and released from custody. However, on March 16, 2007, Renfrow reported to the Simpson County Sheriffs Department after Investigator Gunter had placed a card on the door of Renfrow’s home and requested that Renfrow report to the Simpson County Sheriffs Department. Investigator Gunter later explained that he intended to serve Renfrow with a capias. However, when Renfrow reported, he informed Investigator Gunter that he would waive his rights to remain silent and to have an attorney present and would allow Investigator Gunter to interview him. Renfrow executed a document waiving his rights and allowed Investigator Gunter to interview him while Sheriff Kenneth Lewis was present. During that interview, Ren-frow stated that he knew he had pictures depicting child pornography on his computer. However, he also stated that he obtained the pictures inadvertently. To summarize Renfrow’s version of events, he received unsolicited e-mails that included the pictures depicting child pornography, he did not know who sent him the pictures, and he tried to delete the pictures.
 

 ¶ 5. Investigator Gunter attempted to create a videotaped recording of Renfrow’s interview. However, after the interview had ended, Investigator Gunter discovered that he had failed to activate a switch that would have created an audio recording of the interview. In other words, Investigator Gunter only had a video recording of the interview. There was no audio recording.
 
 *623
 
 Investigator Gunter then wrote a summary of Renfrow’s interview. Sheriff Lewis signed Investigator Gunter’s summary and indicated that he shared Investigator Gun-ter’s recollection of Renfrow’s interview.
 

 ¶ 6. On October 1, 2007, the Simpson County Grand Jury returned an indictment against Renfrow, charging him with one count of touching a child inappropriately in violation of Mississippi Code Annotated section 97-5-23(1) (Rev.2006). The grand jury also charged Renfrow with one count of willful possession of child pornography. Renfrow waived arraignment and pled not guilty.
 

 ¶ 7. Renfrow filed numerous pretrial motions. For our purposes, only a few of those motions are noteworthy. On February 13, 2008, Renfrow filed a motion to review the State’s evidence. That same day, Renfrow filed a relatively generic motion to suppress practically any evidence the State obtained from any source. On February 28, 2008, Renfrow filed a motion for a continuance. Renfrow requested a continuance so he could review the discovery tendered by the State. Renfrow also requested that he and his computer expert be allowed access to the original hard drive that was removed from his computer. On March 5, 2008, Ren-frow filed an amended motion to suppress the State’s evidence. The majority of Renfrow’s amended motion to suppress was identical to his original motion to suppress. However, Renfrow added a claim that “[t]he State has wholly failed to protect and secure the [evidence obtained from Renfrow’s computer], and it has been contaminated and subjected to potential virus infection.”
 

 ¶ 8. On March 7, 2008, the circuit court conducted a hearing on Renfrow’s first series of pretrial motions. The events that transpired during the hearing on those motions will be discussed in greater detail as necessary in the analysis of Renfrow’s issues. Suffice it to say that the circuit court granted Renfrow’s motion for a continuance so Renfrow’s computer expert could review a copy of Renfrow’s hard drive. The circuit court rescheduled Ren-frow’s trial date and set Renfrow’s trial for March 27, 2008. However, the circuit court also denied Renfrow’s motions to suppress the evidence.
 

 ¶ 9. During the March 7, 2008, hearing, Renfrow moved to dismiss the indictment. Renfrow argued that section 97-5-33(5) is impermissibly vague because it does not include a mens rea component. The State pointed out that, while there is no mens rea component listed in that statutory provision, the language in the indictment required the State to prove that Renfrow willfully possessed child pornography. The circuit court denied Renfrow’s motion to dismiss the indictment and noted that because the indictment contained the allegation that Renfrow willfully possessed child pornography, the State would be obligated to prove that portion of the allegation beyond a reasonable doubt. Finally, the circuit court rescheduled Renfrow’s trial date.
 

 ¶ 10. On March 14, 2008, the State filed a document titled “entry of nolle prosequi” and moved that the circuit court dismiss the charge that Renfrow inappropriately touched the children. The circuit court executed the consent portion of that document on the same day. On March 19, 2008, Renfrow filed three new pretrial motions. Two of those motions are pertinent to the issues on appeal. The first of those pertinent motions was Renfrow’s second motion for a continuance. Renfrow’s March 19, 2008, motion for a continuance was based on the fact that, although the State provided his expert with access to an exact copy of the hard drive, the State had not given his expert access to the
 
 original
 
 
 *624
 
 hard drive. Additionally, Renfrow filed a renewed motion to suppress the evidence. Renfrow claimed the circuit court should suppress the evidence that Investigator Gunter obtained when he executed the search warrant. The most significant evidence that Investigator Gunter seized was Renfrow’s computer and all of the evidence that was obtained from his computer. Renfrow argued that it was appropriate to suppress that evidence because the events that led to the acquisition of the search warrant occurred nine or ten months before Investigator Gunter sought to obtain the search warrant.
 

 ¶ 11. On March 20, 2008, the circuit court conducted another series of hearings on Renfrow’s motions. After some discussion, it was resolved that the State would allow Renfrow’s expert to make her own copy of Renfrow’s original hard drive, subject to the conditions that Renfrow’s expert make her copy at the Cyber Crime Center under the supervision of employees of the Cyber Crime Center, who would ensure that Renfrow’s expert maintained the evidentiary integrity of Renfrow’s original hard drive. However, the circuit court did not grant Renfrow’s request for a continuance.
 

 ¶ 12. As for Renfrow’s renewed motion to suppress the evidence obtained by the search warrant, the circuit court found that, although the children indicated that the alleged inappropriate touching occurred in April or May 2005, the children did not report the allegation until late February or early March 2006. The circuit court also found that Investigator Gunter acted on the allegations as soon as he found out about them. Accordingly, the circuit court denied Renfrow’s renewed motion to suppress. There were no further delays, and Renfrow went to trial as scheduled.
 

 ¶ 13. The events that transpired at Renfrow’s trial will be discussed as necessary in the analysis portion of this opinion. As previously mentioned, the jury found Renfrow guilty of possession of child pornography. Following Renfrow’s unsuccessful post-trial motions for a judgment notwithstanding the verdict (JNOV) or, alternatively, a new trial, the circuit court sentenced Renfrow to fifteen years in the custody of the MDOC. Aggrieved, Renfrow appeals. We have restructured the issues and Renfrow’s arguments to provide greater clarity, as Renfrow’s claims require significantly more separate discussions than the six issues he lists.
 

 ANALYSIS
 

 I. RENFROW’S MOTION TO DISMISS THE INDICTMENT
 

 ¶ 14. Count II of the indictment charged Renfrow with violating section 97-5-33(5) of the Mississippi Code, which states that “[n]o person shall, by any means including computer, possess any photograph, drawing, sketch, film, video tape or other visual depiction of an actual child engaging in sexually explicit conduct.” Miss.Code Ann. § 97-5-33(5). Renfrow moved to dismiss Count II of the indictment on the basis that section 97-5-33(5) is unconstitutionally vague.
 

 ¶ 15. The circuit court denied Ren-frow’s motion and held as follows:
 

 I agree subsection (5) of 97-5-33 does not contain the word “knowingly” or “willfully” or anything like that. In a sense, the indictment which does contain the word “willfully” and which has been equated numerous times, dozens, if not hundreds, of times with knowingly in all kinds of different cases by our supreme court. The indictment in effect puts more burden on the State than the statute does. The State has nailed themselves down to proving that the defen
 
 *625
 
 dant willfully, i.e., knowingly, possessed this alleged child pornography. The statute doesn’t say they have to do it, but the indictment does. So that’s what you’re stuck with. So, for this case, that motion is denied.
 

 ¶ 16. Renfrew claims the circuit court erred. Our supreme court has directed that, upon review of a circuit court’s decision to deny a motion to dismiss the indictment based on a claim that a statute is unconstitutionally vague, the appropriate test is to determine “whether the statute defines the criminal offense with sufficient definiteness such that a person of ordinary intelligence has fair notice of what conduct is prohibited.”
 
 Lewis v. State,
 
 765 So.2d 493, 499(¶ 25) (Miss.2000).
 

 ¶ 17. Renfrew notes that section 97-5-33(1), (3), (6), and (7) contain a mens rea aspect, but section 97-5-33(5) does not contain a mens rea aspect. According to Renfrew’s logic, “to allow this section to stand as written, without requiring some mental element on the part of a defendant, would be tantamount to not affording a person of ordinary intelligence, [sic] fair notice of exactly what conduct is prohibited.” Renfrew also argues that section 97-5-33(5), as written, punishes people who have unintentionally or unknowingly had child pornography placed on their computers through computer viruses or computer hackers.
 

 ¶ 18. There can be no doubt that a criminal statute is not unconstitutionally vague solely because it does not contain a mens rea element. “The Legislature may define a crime which depends on no mental element and consists only of forbidden acts or omissions.”
 
 Roberson v. State,
 
 501 So.2d 398, 401 (Miss.1987) (quoting
 
 Wright v. State,
 
 236 So.2d 408, 413 (Miss.1970)). “In that instance, the intent to do the forbidden act is the only intent necessary to complete the offense.”
 
 Id.
 

 ¶ 19. However, our decision need not turn on whether section 97-5-33(5) is unconstitutionally vague simply because it does not contain a mens rea element. The State charged Renfrew with willful possession of child pornography. That is, Count II of the indictment against Renfrew contained language that included an allegation that Renfrew willfully possessed child pornography. By including that language, the State imposed a mens rea requirement, and it was obligated to prove that aspect of the charge beyond a reasonable doubt. Consequently, under the circumstances, it is irrelevant that section 97-5-33(5) does not include a mens rea element. We find no merit to this issue.
 

 II. RENFROW’S ATTEMPTS TO SUPPRESS THE EVIDENCE
 

 ¶ 20. Renfrew filed multiple motions intended to suppress the evidence against him. Based on several different rationales, Renfrew vigorously attempted to suppress the evidence that was obtained from his computer. Renfrew also attempted to suppress Investigator Gunter’s written recollection of Renfrew’s March 16, 2007, interview. For clarity’s sake, we have restructured Renfrew’s issues and the various lines of reasoning for those issues. As we review Renfrew's litany of arguments under these issues, we are mindful of our standard of review. “The standard of review regarding the admission or exclusion of evidence is abuse of discretion.”
 
 Terrell v. State,
 
 952 So.2d 998, 1005(¶ 31) (Miss.Ct.App.2006). We will only find an abuse of discretion if “a defendant shows clear prejudice resulting from an undue lack of constraint on the prosecution or undue constraint on the defense.”
 
 Id.
 
 In other words, “[t]his Court shall not disturb a trial court’s decision unless it is clearly wrong.”
 
 Id.
 

 
 *626
 
 A. RENFROW’S COMPUTER
 

 ¶ 21. Renfrow repeatedly sought to suppress any and all evidence that the State obtained from his computer. Ren-frew's reasoning was based on the following concepts: (1) there was no probable cause to issue the search warrant because the events that led to Investigator Gun-ter’s decision to obtain the search warrant occurred long before Investigator Gunter sought to obtain the warrant; (2) his computer was contaminated by viruses while it was in the State’s custody; (3) there was a discrepancy between the computer’s actual serial number and the serial number as recorded by the Cyber Crime Center; and (4) the State failed to establish a proper chain of custody. We discuss each of Ren-frew’s arguments in turn.
 

 1. Probable Cause for the Search Warrant
 

 ¶ 22. Renfrow claims there was no probable cause for the search warrant that allowed Investigator Gunter to seize the computer. We must exercise caution while discussing this claim, because the State dismissed count one of the two-count indictment by nolle prosequi, and there is still a possibility that the State could re-indict Renfrow for those allegations. In any event, Renfrow contends that the circuit court erred when it did not find that there was no probable cause to issue the search warrant because, according to the two children central to this case, the alleged inappropriate touching occurred nine or ten months before Investigator Gunter sought to obtain the search warrant.
 

 ¶ 23. The circuit court judge stated, “as I see the motion, the narrow issue is whether ... dismissing Court One affected the search warrant. I find it does not.” According to Renfrow, “the information relied upon was given by two young children almost one year after the alleged incident, and [it] cannot be deemed credible because they could not state a specific date for the alleged incident.” Renfrow concludes that “the time lapse of almost one year certainly rendered the search warrant stale.” We disagree.
 

 ¶ 24. “When reviewing a finding of probable cause to issue a warrant[,] this Court does not make a de novo determination of probable cause, but only determines if there was a substantial basis for the magistrate’s determination of probable cause.”
 
 Foley v. State,
 
 914 So.2d 677, 685(¶ 12) (Miss.2005) (citation and internal quotations omitted). “The task of the issuing magistrate is simply to make a practical, common-sense decision based on all the circumstances set forth in the affidavit before him, including the ‘veracity’ and ‘basis of knowledge’ of persons supplying hearsay information.”
 
 Id.
 
 at 685-86.
 

 ¶ 25. Renfrow claims that, because the children at issue did not notify an adult of the alleged inappropriate touching and the images on Renfrow’s computer for approximately ten or eleven months, there was no probable cause for the search warrant. “[S]taleness of information may be a defect in probable cause for search warrants.”
 
 Flake v. State,
 
 948 So.2d 493, 496(¶ 9) (Miss.Ct.App.2007). However, “[t]he determination of factual currency in the affidavit for a search warrant would be but one factor in the totality of the circumstances for establishing the existence of probable cause.”
 
 Id.
 

 ¶ 26. Although it is true that the children involved in the underlying alleged incident stated that Renfrow showed them pictures of naked adults and children on his computer and suggested that Renfrow may have touched them inappropriately sometime in April or May 2005, that is not the end of the analysis. Authorities were unaware of the allegation until March
 
 *627
 
 2006. As mentioned, Erwin, a child advocacy counselor, interviewed the children promptly after one of the children first gave a school counselor reason for concern. Investigator Gunter promptly received a copy of the videotape of Erwin’s interviews. After Investigator Gunter watched the interview, he promptly sought to obtain the search warrant. The probable cause for the search warrant was not rendered stale simply because Investigator Gunter first discovered the allegations nine or ten months after the alleged incident occurred. This is especially true in the context of allegations by small children, who may be too ashamed or frightened to inform others that something inappropriate may have occurred because they were expressly ordered or threatened to remain silent. Based on the totality of the circumstances, we find that there was a substantial basis for the issuance of the search warrant. Additionally, it was reasonable for the judge who issued the search warrant to conclude that images on a computer could still be recovered by forensic methods nine or ten months after the children saw them. Sullivan’s examination report stated that she was able to recover “all available files[,] including those previously deleted.” Accordingly, because the images were stored on a computer, the probable cause for Investigator Gunter’s search warrant was not rendered stale by the passage of time. We find no merit to this issue.
 

 2. Integrity of the Original Hard Drive
 

 ¶ 27. Renfrow claims that the circuit court should have prohibited the State from introducing any evidence that was obtained from his computer because the State failed to protect the integrity of Ren-frew’s original hard drive. Renfrow contends that there are three reasons to conclude that the State failed to protect the integrity of the original hard drive: (1) the possibility that Renfrow’s hard drive was exposed to virus contamination while in the custody of the Cyber Crime Center; (2) the presence of two “bad sectors” on Ren-frow’s original hard drive; and (3) his allegation that the Cyber Crime Center did not have a sufficient fail-safe system to protect the integrity of the original hard drive.
 

 i. Virus Contamination
 

 ¶ 28. Renfrow claims that the circuit court should have suppressed the evidence that was obtained from his computer because the original hard drive might have been exposed to virus contamination while it was in the State’s custody. According to Renfrow, his original hard drive was probably contaminated while it was in the Cy-ber Crime Center’s custody “because so many people had access to the [evidence] vault and made copies from the original hard drive.” First and foremost, Ren-frow’s statement is a mischaracterization of the evidence. According to the expert witnesses from the Cyber Crime Center, two or three people had access to the Cyber Crime Center’s vault at any given time.
 

 ¶ 29. Moreover, Renfrow’s argument under this heading is purely speculative. There is absolutely no evidence in the record that either the original or one of the forensic duplicate copies of Renfrow’s hard drive were ever exposed to computer virus contamination while in the State’s custody. While there was some testimony that there were viruses, spyware, adware, or “Trojan” programs on Renfrow’s original hard drive, there was no evidence that those items first appeared on the original hard drive while it was in the State’s custody. The only reasonable inference is that those items were on Renfrow’s original hard drive when Investigator Gunter seized Renfrow’s entire computer. There was no
 
 *628
 
 testimony that those items were not on Renfrow’s hard drive before Investigator Gunter seized Renfrow’s computer. There was no evidence that anyone from the Cyber Crime Center exposed Renfrow’s hard drive to possible contamination by logging on the Internet or any other source of contamination. Additionally, the State’s expert witnesses testified that their use of a “write-blocker” prevented any alterations to Renfrow’s original hard drive. Renfrow never presented any evidence to the contrary. There is no merit to this purely speculative claim.
 

 ii. The Presence of “Bad Sectors” on the Original Hard Drive
 

 ¶ 30. Renfrow’s next argument under this heading involves the presence of two “bad sectors” on the original hard drive. To support his claim that the Cy-ber Crime Center failed to protect the integrity of his original hard drive, Ren-frow references a portion of Leavitt’s testimony in which Leavitt testified that there were two “bad sectors” on Renfrow’s original hard drive. Renfrow states that Leav-itt “testified that the damaged hard drives have something to do with the way the hard drive operates.” Although Renfrow accurately states that Leavitt found two “bad sectors” on Renfrow’s hard drive, Renfrow is inaccurate in the remainder of his characterization of Leavitt’s testimony.
 

 ¶ 31. Leavitt testified that he found two “bad sectors” on Renfrow’s hard drive. The State asked Leavitt to elaborate on what the “bad sectors” meant. Leavitt testified:
 

 A bad sector typically could mean some type of physical damage to the hard drive. These are electronic parts. They have physical moving parts, and they become damaged just like maybe your cassette tape that you listen to in the radio might — portions of it could get damaged where you couldn’t hear it. It’s the same way with a hard drive. Those portions of the hard drive can become damaged and be unusuable by the — by the hardware.
 

 Leavitt went on to testify that it is not uncommon to find bad sectors on a hard drive. Leavitt explained that he examined the damaged sectors to determine whether there was any information stored on them and found no information. Additionally, Leavitt testified that the two damaged sectors would have held very little information. The State asked Leavitt to elaborate regarding the information that could be stored on the two damaged sectors compared to the information that could be stored on the entire hard drive. Leavitt explained that the two sectors would represent “maybe a crumb” of an entire pie.
 

 ¶ 32. On cross-examination, Renfrow’s attorney asked Leavitt whether the two “bad sectors” would influence the way Renfrow’s computer operated. Leavitt testified that they would not influence the way Renfrow’s computer operated, but they would influence the way the hard drive operated in that the hard drive would skip over the two damaged sectors and simply move on to the next undamaged sector of the hard drive. Renfrow’s attorney
 
 never
 
 asked Leavitt to testify as to how the “bad sectors” might have become damaged. Additionally, Renfrow’s computer expert, Nannette Pate, did not discuss the presence of the “bad sectors” during her testimony. As a result, there was no evidence that the “bad sectors” were damaged during the time Renfrow’s hard drive was in the custody of the Simpson County Sheriffs Department or the Cyber Crime Center. Instead, Sullivan’s and Leavitt’s testimonies were that the Cyber Crime Center’s first priority was to maintain the integrity of the original hard drive. There is no basis to con-
 
 *629
 
 elude that the presence of the “bad sectors” are indicative of the Cyber Crime Center’s failure to protect the integrity of Renfrow’s original hard drive. Renfrow’s claim under this heading is entirely merit-less.
 

 iii. The Cyber Crime Center’s Fail-Safe Systems
 

 ¶ 33. Finally, Renfrow claims the circuit court should have suppressed the evidence that was obtained from his computer because the Cyber Crime Center did not have adequate fail-safe systems to protect the integrity of his original hard drive. Again, Renfrow completely mischaracter-izes the evidence.
 

 ¶ 34. Investigator Gunter testified that Renfrow’s computer was off when he first encountered it in Renfrow’s home. Investigator Gunter simply unplugged Ren-frow’s computer when he seized it. He did not turn on Renfrow’s computer to prevent the possibility of any alterations to Ren-frow’s hard drive. He placed evidence tape over the plug ports to the computer to prevent anyone from hooking the computer up and turning it on.
 

 ¶ 35. Sullivan and Leavitt testified in great detail regarding the Cyber Crime Center’s fail-safe systems. They described how each aspect of the Cyber Crime Center’s fail-safe systems and the investigative process were designed specifically to protect the integrity of an original hard drive. Sullivan removed the original hard drive and placed a write-blocking device on it to prevent any alterations to the original hard drive. Sullivan made an exact copy of the hard drive and examined the copy. The intended purpose behind examining the copy was to protect the integrity of the original hard drive. Leav-itt made a similar duplicate copy for Ren-frow’s expert to examine. Again, the specific purpose of making a copy was to protect the integrity of the original evidence. Renfrow’s attorney wanted to boot up the original hard drive so his expert could examine it. The State opposed Ren-frow’s request and explained that booting up the original hard drive would destroy the integrity of the original evidence. Suffice it to say, every step of the State’s procedure to gather evidence from the original hard drive was designed to protect the integrity of the evidence. This issue, like the other two under this heading, is meritless.
 

 3. Discrepancy in Serial Numbers
 

 ¶ 36. Renfrow draws our attention to a discrepancy in his serial number as it appears on his computer and the serial number that the Cyber Crime Center placed on an evidence receipt when Investigator Gunter delivered Renfrow’s computer to the Cyber Crime Center. Renfrow makes mention of the discrepancy in his claim that the State failed to establish a chain of custody. For brevity’s sake, we discuss that issue in a separate heading.
 

 ¶ 37. Renfrow’s computer bore the serial number 0151002229. When Leavitt filled out the evidence receipt, he listed the serial number as 015100229. After the hearing on Renfrow’s first volley of motions, the circuit court found that the discrepancy in the serial numbers was nothing more than a clerical error. Sullivan’s report bore the same serial number that appeared on the computer. While Ren-frow references the discrepancy in his brief and implies that the discrepancy somehow reflects on the State’s chain of custody, he provides no argument to suggest that the circuit court erred when it found that the discrepancy in recording the computer’s serial number was anything more than a clerical error involved with omitting one repetitive digit in the serial
 
 *630
 
 number. Consequently, we do not find that the circuit court abused its discretion when it declined to suppress the evidence obtained from the computer simply due to a clerical error.
 

 4. Chain of Custody
 

 ¶ 38. Next, Renfrew claims that the circuit court should have suppressed evidence that the State obtained from the copy of Renfrew’s original hard drive because the State failed to demonstrate a proper chain of custody regarding his computer. Renfrew’s reasoning is based on the same arguments he raises regarding the Cyber Crime Center’s fail-safe systems, the presence of bad sectors on his original hard drive, and the number of people who had access to the Cyber Crime Center’s vault. Renfrew does not claim that any specific portion of the chain of custody was insufficient. Accordingly, for brevity’s sake, it is unnecessary to discuss the entire chain of custody when the argument for suppression is based on such a broad allegation.
 

 ¶ 39. Yet again, Renfrew’s claim is based on a mischaracterization of the evidence. There was no testimony that “so many” people had access to the Cyber Crime Center’s evidence vault. Instead, Sullivan testified that, depending on the actual date, either two or three people at any given time had a key to access the Cyber Crime Center’s evidence vault. The State presented the Cyber Crime Center’s evidence log. That log detailed each time either Renfrew’s original hard drive or a copy of the original hard drive were removed from the Cyber Crime Center’s vault. The evidence log also detailed who removed the original hard drive or a copy of the original hard drive. Because the State presented an adequate chain of custody and Renfrew failed to point out any specific inadequacy in that chain of custody, we find no merit to this allegation.
 

 5. Duplicate Copy of the Hard Drive
 

 ¶ 40. In his final claim under this heading, Renfrew argues that the circuit court “erred in allowing the introduction of the copy of the hard drive as opposed to the original.” There is no merit to this claim. Sullivan and Leavitt both explained why it was necessary to create a duplicate copy of the original hard drive and why it was necessary to test the duplicate. A forensic examination of Renfrew's original hard drive would have altered the original hard drive and, by extension, would have completely destroyed any evidentiary value of the original hard drive. To maintain the integrity of the original hard drive, it was necessary to create a forensic duplicate of the original hard drive and then conduct all examinations on the forensic duplicate. There is no merit to this claim.
 

 B. RENFROW’S STATEMENT
 

 ¶ 41. Next, Renfrew argues that the circuit court erred when it did not suppress Investigator Gunter’s statement regarding his recollection of his interview of Renfrew. In an effort to serve Renfrew with a capias, Investigator Gunter left a note on Renfrew's door and requested that Renfrew report to the Simpson County Sheriffs Department. Investigator Gun-ter’s note only included a request that Renfrew go to the sheriffs department. Investigator Gunter’s note did not mention the capias.
 

 ¶ 42. In any event, Renfrew went to the sheriffs department as requested. However, once there, Renfrew expressed his willingness to waive his rights and submit to an interview by Investigator Gunter. Renfrew executed a document and waived his rights. Investigator Gunter interviewed Renfrow while Sheriff Lewis sat-in
 
 *631
 
 on the interview. Investigator Gunter intended to create a videotape of the interview.
 

 ¶ 43. After the interview, Investigator Gunter discovered that he had only obtained a video recording of Renfrew's interview. Investigator Gunter did not have any audio recording of the interview. Investigator Gunter then “immediately sat down and did a statement of facts to what he and Mr. Renfrow [had] talked about.” Sheriff Lewis signed Investigator Gunter’s recollection of the interview and indicated that he agreed with Investigator Gunter’s recollection. According to Investigator Gunter, during the interview, Renfrow stated that he knew he had child pornography on his computer. However, he also stated that he obtained the child pornography inadvertently. According to Renfrow, people on the Internet sent the images without his solicitation of them.
 

 ¶ 44. Renfrow filed a motion to suppress Investigator Gunter’s statement regarding the interview. The circuit court denied Renfrew’s motion. Renfrow claims the circuit court erred. According to Ren-frow, the circuit court should have suppressed Investigator Gunter’s statement because: (1) it was not voluntary because Investigator Gunter enticed Renfrow to come to the sheriffs department; (2) Ren-frow never signed the statement; and (3) it was not Renfrew’s statement; instead, it was merely Investigator Gunter’s recollection of what was said during Renfrew’s interview.
 

 ¶ 45. As for Renfrew’s claim that Investigator Gunter enticed him to go to the sheriffs department, Investigator Gun-ter merely left a note at Renfrew’s house. In that note, Investigator Gunter requested that Renfrow go to the sheriffs department, but Investigator Gunter did not ask Renfrow to waive his rights or agree to be interviewed. There is no evidence that Investigator Gunter or anyone else promised Renfrow anything in exchange for his agreeing to be interviewed. There is no evidence that Renfrow went to the sheriffs department or agreed to be interviewed based on any enticement by Investigator Gunter or anyone else. We find no error in the circuit court’s decision to deny suppressing Investigator Gunter’s recollection statement based on Renfrew's allegation of enticement.
 

 ¶ 46. Renfrow claims that the circuit court should have suppressed Investigator Gunter’s recollection of Ren-frew's interview because it was not actually Renfrew’s statement and Renfrow never signed Investigator Gunter’s recollection statement. However, admissibility of an unsigned statement is an issue of the accuracy of a statement and not the voluntariness of a statement.
 
 Craft v. State,
 
 380 So.2d 251, 254 (Miss.1980). We find no merit to Renfrew’s claim that the circuit court erred when it declined to suppress Investigator Gunter’s recollection statement based on the fact that it was Investigator Gunter’s recollection of the interview and Renfrow did not sign the statement. Those matters pertained to the weight and credibility of the statement, and those matters are for the jury to consider. “Matters concerning what weight and credibility to give to the evidence presented are to be decided by the jury.”
 
 Walker v. State,
 
 799 So.2d 151, 153(¶ 4) (Miss.Ct.App.2001). It bears mentioning that Investigator Gun-ter’s recollection of Renfrew's statements corroborated Renfrew’s defense at trial. That is, Investigator Gunter noted that Renfrow said he did not solicit the images depicting child pornography and that Ren-frow did not intentionally obtain the images. That was Renfrew’s theory of the case. Accordingly, Renfrow was not prejudiced by the circuit court’s decision to deny Renfrew’s motion to suppress Inves
 
 *632
 
 tigator Gunter’s recollection of Renfrew’s interview. This issue is without merit.
 

 III. RENFROW’S MOTIONS FOR CONTINUANCE
 

 ¶ 47. On February 28, 2008, Ren-frow filed a motion for a continuance. At that time, Renfrow’s trial was scheduled for March 19, 2008. Renfrow requested a continuance so that his attorney would have time to review discovery that the State had provided on February 8, 2008. Renfrow also filed a motion to view the evidence. In that motion, Renfrow requested that the circuit court allow his computer expert to review Renfrow’s hard drive. On March 7, 2008, the circuit court conducted a hearing on Renfrow’s numerous pretrial motions. During that hearing, Renfrow’s attorney complained that, although the State had provided its reports regarding the presence of child pornography on Renfrow’s computer, Renfrow’s computer expert had not had an opportunity to personally observe and review a copy of Renfrow’s hard drive. The circuit court judge stated that he would “grant [Ren-frow’s] motion [to view the evidence] with respect to going and viewing the evidence.” Accordingly, the circuit court judge instructed the State to provide Ren-frow’s attorney with dates that Renfrow’s expert could go to the Cyber Crime Center and review a copy of Renfrow’s hard drive. Additionally, the circuit court judge rescheduled Renfrow’s trial date to March 27, 2008.
 

 ¶ 48. On March 19, 2008, Renfrow filed another motion for a continuance. In his second motion for a continuance, Renfrow claimed that he had “still been denied ... access to all of the evidence of the State in this matter, more particularly, the original hard drive and the original computer intact as it was obtained.” In other words, Renfrow requested that the circuit court continue his trial until his computer expert could inspect Renfrow’s original hard drive after re-installing the hard drive in Ren-frow’s computer tower. On March 20, 2008, the circuit court conducted a hearing on Renfrow’s second barrage of pretrial motions.
 

 ¶ 49. During the hearing on Renfrow’s second motion for a continuance, the State vigorously objected to Renfrow’s computer expert being allowed to re-install and inspect Renfrow’s original hard drive. Leavitt testified dut'ing that hearing. Leavitt explained that Renfrow’s expert would destroy the evidentiary value if she was allowed to install it in Renfrow’s tower and boot it up.
 
 [3]
 
 Leavitt elaborated and testified that, if one were to boot up Ren-frow’s original hard drive without attaching the write-blocking device, “over 1,000 files would be changed immediately.” The “registry files” would be modified, and the original data could never be recovered again. Leavitt explained that booting up the original hard drive would also change all of the “time date stamps” throughout the computer and the “log files would be changed, deleted, or recreated in some cases.” Finally, Leavitt testified that if Renfrow’s expert were allowed to do as Renfrow requested, that act would “certainly change the entire makeup of [Ren-frow’s] hard drive.” On cross-examination, Leavitt explained that neither he nor anyone else who performs forensic examinations for the Cyber Crime Center ever examined an original hard drive or booted up a copy of a hard drive — much less an original hard drive — without using the previously-mentioned write blocker. The circuit court resolved the matter by in
 
 *633
 
 structing the Cyber Crime Center to allow Renfrow’s expert to create her own forensic duplicate copy of Renfrow’s original hard drive. However, when Renfrow’s expert appeared at the Cyber Crime Center, she was not equipped to prepare her own duplicate. Consequently, Leavitt prepared another duplicate copy of Renfrow’s original hard drive as Renfrow’s expert, Pate, observed. To summarize, Pate had access to two forensic duplicates of Ren-frow’s original hard drive.
 

 ¶ 50. Renfrow claims that the circuit eourt erred when it denied his motion for continuance. “Trial judges have wide latitude in deciding whether to grant continuances, and that decision is left to the sound discretion of the trial judge.”
 
 Evans v. State,
 
 899 So.2d 890, 896(¶ 23) (Miss.Ct.App.2004) (quoting
 
 Adams v. State,
 
 772 So.2d 1010, 1014(¶ 16) (Miss.2000)). A trial court’s decision to deny a motion for a continuance is not reversible “unless manifest injustice appears to have resulted from the denial.”
 
 Id.
 

 ¶ 51. First and foremost, Ren-frow does not indicate what his attorney or his expert might have discovered if the circuit court would have granted his motion for a continuance. Additionally, the undisputed testimony during the hearing on Renfrow’s second motion for a continuance was that Renfrow’s expert would destroy the evidentiary value of the evidence if the circuit court consented to Renfrow’s request. What is more, Renfrow seems to argue that, if the circuit court would have granted his second motion for a continuance, his attorney or his expert
 
 might
 
 have made some unspecified discovery that may or may not have benefitted his defense. Renfrow had no specific purpose in mind. He simply wanted more time to see if his expert could find something. The circuit court granted Renfrow’s first motion for a continuance and gave Renfrow’s expert more than one opportunity to review the same evidence that the State had. As the State notes, Renfrow’s attorney presented no proof as to how he could have been better prepared to defend Renfrow if he would have had additional time to prepare for trial. Under the circumstances, we find that the circuit court did not abuse its discretion when it denied Renfrow’s second motion for a continuance. Accordingly, we find no merit to this issue.
 

 IV. SUFFICIENCY OF THE EVIDENCE
 

 ¶ 52. Renfrow claims the evidence against him was insufficient to convict him of possession of child pornography. In summary, he argues that: he did not know those files were on his computer; he never sent the files to anyone; and he was a novice with using computers.
 

 ¶ 53. “A motion for a judgment notwithstanding the verdict is a challenge to the sufficiency of the evidence.”
 
 Gilbert v. State,
 
 934 So.2d 330, 335(¶ 9) (Miss.Ct.App.2006). As our Mississippi Supreme Court has stated:
 

 in considering whether the evidence is sufficient to sustain a conviction in the face of a motion for directed verdict or for judgment notwithstanding the verdict, the critical inquiry is whether the evidence shows beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.... [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Should the facts and inferences considered in a challenge to the sufficiency of
 
 *634
 
 the evidence point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty, the proper remedy is for the appellate court to reversé and render.
 

 Bush v. State,
 
 895 So.2d 836, 843(¶ 16) (Miss.2005) (internal citations and quotations omitted). However, this Court will determine that there was sufficient evidence to sustain the jury’s verdict if the evidence was “of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense.”
 
 Id.
 
 (internal citations and quotations omitted).
 

 ¶ 54. Renfrow was indicted for possession of child pornography in violation of Mississippi Code Annotated section 97-5-33(5). As mentioned, although section 97-5-33(5) does not contain a mens rea element, the language of the indictment included an allegation that Renfrow willfully possessed the images depicting child pornography.
 

 ¶ 55. It was undisputed that several images depicting child pornography were found on Renfrew's computer. Renfrow argued that he did not solicit the images at issue and that he obtained them inadvertently. According to Renfrow, he had limited knowledge about computers, and the images appeared on his computer after he clicked the word “attachment” at the bottom of the computer screen while using a “chat program” called ICQ. However, Ren-frow also attempted to attribute the child pornography images to other sources. Pate, Renfrew's expert witness, testified that: (a) she found numerous viruses on the duplicate clone of Renfrew's hard drive; (b) she found a “porn net Trojan virus” on Renfrew’s computer; (c) the “porn net Trojan virus” causes adult pornographic images pop up on a computer screen; (d) she found a “backdoor Trojan virus” that allows someone to take control of a computer without an owner’s knowledge; (e) a “backdoor Trojan virus” can hide and disguise itself; and (f) Renfrow could have accepted the images without knowing exactly what they were.
 

 ¶ 56. However, there was no evidence that any of the computer viruses or other programs that Pate described actually transferred any of the images of child pornography. Pate’s testimony in that regard was merely that the viruses or “Trojan” programs
 
 theoretically
 
 could have been the reason the images at issue were on Renfrew's computer. Pate’s testimony was in stark contrast to Sullivan’s testimony and Leavitt’s testimony. Both Leavitt and Sullivan testified that viruses or “Trojan” programs were not responsible for placing the pornographic images of children on Renfrew’s computer. Leavitt testified that, because Renfrow used a dial-up internet connection that used “dynamic IP addressing,” it was impossible for someone to remotely control Renfrew's computer. Both Leavitt and Sullivan testified that Renfrow created a file under the title “PEDO” and stored the images at issue in that file. Leavitt testified that one of the images of child pornography was attached to an e-mail that was stored in Renfrew’s “outbox.” Renfrew’s e-mail was protected by a password.
 

 ¶ 57. Additionally, the State’s experts discovered e-mails that were sent from Renfrew’s e-mail address. The only inference presented at trial was that Renfrow wrote the stories contained in each e-mail.
 
 [4]
 
 
 *635
 
 One such e-mail included a story that Ren-frow wrote in which a fifteen-year-old boy reminisced in extremely graphic detail how he became attracted to his pre-teen sister and eventually raped her. In a different e-mail, Renfrew wrote a story about a father who proudly reminisces in extremely graphic detail about the time he encouraged his twelve-year-old twin son and daughter to have sex with one another. In that story, the father molested both children, and after encouraging his twelve-year-old twin children to have sex with one another, the father committed statutory rape of his twelve-year-old daughter. The father continued to do so for months, until his daughter became pregnant. In the story within that e-mail, the father closed by describing how he held his granddaughter while hoping for more grandchildren so he could “educate” another generation of his family. In yet another e-mail, Renfrew wrote a story about an adult male who fondly described having sex with his preteen niece and daughter.
 

 ¶ 58. Finally, Dr. Larry Gibson, a physician certified in family medicine, testified that the images at issue depicted sexually explicit conduct involving girls as young as six or seven years old. According to Dr. Gibson, the eldest child depicted in the various images was approximately twelve years old.
 

 ¶ 59. We can confidently conclude that reasonable and fair-minded jurors could have found that the State proved each element of the offense as stated in the indictment beyond a reasonable doubt. Accordingly, we find that the circuit court did not abuse its discretion when it denied Renfrew’s motion for a JNOV. We find no merit to this issue.
 

 V. WEIGHT OF THE EVIDENCE
 

 ¶ 60. Renfrew claims the circuit court erred when it denied his motion for a new trial. According to Renfrew, the circuit court should have granted his motion for a new trial because the jury’s verdict is contrary to the overwhelming weight of the evidence. We are mindful that; as we review the circuit court’s decision to deny a motion for a new trial, this Court “will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.”
 
 Bush,
 
 895 So.2d at 844(¶ 18). The supreme court has further instructed that, when reviewing a trial court’s decision to deny a motion for a new trial;
 

 the court sits as a thirteenth juror. The motion, however, is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict. However, the evidence should be weighed in the light most favorable to the verdict. A reversal on the grounds that the verdict was against the overwhelming weight of the evidence, unlike a reversal based on insufficient evidence, does not mean that acquittal was the only proper verdict. Rather, as the “thirteenth juror,” the court simply disagrees with the jury’s resolution of the conflicting testimony. This difference of opinion does not signify acquittal any more than a disagreement among the jurors themselves. Instead, the proper remedy is to grant a new trial.
 

 Id.
 
 (footnote and internal citations and quotations omitted).
 

 
 *636
 
 ¶ 61. To support this issue, Renfrow discusses the same matters that he discussed to support his challenge of the sufficiency of the evidence. Based on evidence discussed in the analysis under Renfrow’s challenge of the sufficiency evidence, when viewed in the light most favorable to the verdict, we find that the jury’s verdict was not so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. We find no merit to this issue.
 

 ¶ 62. THE JUDGMENT OF THE SIMPSON COUNTY CIRCUIT COURT OF CONVICTION OF POSSESSION OF CHILD PORNOGRAPHY AND SENTENCE OF FIFTEEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, CARLTON AND MAXWELL, JJ., CONCUR.
 

 [1]
 

 . We omit the children's names from this opinion to maintain their anonymity.
 

 [2]
 

 . Those allegations will be discussed in slightly greater detail as necessary. However, Ren-frow was indicted for those allegations at the same time he was indicted for possession of child pornography. The State nolle prossed the inappropriate touching count of the indictment, and Renfrow has not been prosecuted for any alleged inappropriate touching of the children. Because there is still a possibility that Renfrow may be prosecuted for those allegations, we have avoided discussing them in any detail except as necessary. No portion of this opinion should be construed as a finding related to those potential allegations.
 

 [3]
 

 . Using forensic computer tools and programs, it is possible to compare an original hard drive to a forensic duplicate of a hard drive to test for consistency. However, those tools and programs avoid having to boot up an original hard drive.
 

 [4]
 

 . The State's experts found an e-mail from someone who was replying to an earlier e
 
 *635
 
 mail from Renfrew. In Renfrew's earlier email, Renfrew stated that he was writing stories about "very young girls” and that one of his stories was about “a father and his 9-year-old daughter.” Renfrew also asked the recipient whether he was offended by incest.