# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-KA-00278-COA

JOHNNY VONDELLE FORD A/K/A JOHNNY FORD                  APPELLANT

v.

STATE OF MISSISSIPPI                                               APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 02/11/2020 |
| TRIAL JUDGE: | HON. MARK SHELDON DUNCAN |
| COURT FROM WHICH APPEALED: | LEAKE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JAMES HOWARD MURPHY |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ALLISON KAY HARTMAN |
| | LADONNA C. HOLLAND |
| DISTRICT ATTORNEY: | STEVEN SIMEON KILGORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/15/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE CARLTON, P.J., LAWRENCE AND EMFINGER, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     On February 3, 2020, Johnny Ford was convicted of first-degree murder for the shooting of Miesha Bolin. The Leake County Circuit Court sentenced Ford to serve a life sentence in the custody of the Mississippi Department of Corrections (MDOC). Ford appealed his conviction, arguing (1) he was entitled to a directed verdict of not guilty under the *Weathersby*[1] rule; (2) the trial court erred by not letting him represent himself at trial; (3) the trial court erred by permitting testimony summarizing his oral statement to law

---

[1] *Weathersby v. State*, 165 Miss. 207, 147 So. 481 (1933).

enforcement; (4) Ford's counsel was constitutionally ineffective;[2] (5) the State committed prosecutorial misconduct in closing arguments; and (6) his conviction should be reversed as a result of cumulative error. Finding no reversible error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. On the morning of July 21, 2018, at 10:30 a.m., Officer Toby Gill and Officer Jerry Horne responded to a 911 call to a residence in Leake County, Mississippi. The residence they were called to had several houses on the property, including a brick house and mobile homes. The caller reported a "deceased person." Upon arrival, Officers Gill and Horne found the deceased, Bolin, in a pool of dried blood in one of the mobile homes. Bolin had been shot twice, once in her lower left abdomen and once in her head. Officer Gill requested additional help from Leake County Sheriff's Office investigators.

¶3. Investigator Justin Sims and Investigator Billy McMillan arrived on the scene to begin the process of gathering evidence and interviewing witnesses. Subsequent interviews of the individuals at the residence revealed that Bolin and four other individuals had been at this residence for days, drinking alcohol and using methamphetamine. Investigator Sims took several witness statements at the crime scene, including the eyewitness statements of Chris Jones, Katina Townsend, and Desiree Smith.[3] Jones lived at the residence where Bolin was

---

[2] Ford argues his counsel was constitutionally ineffective for failing to propose a "stand your ground" jury instruction, failing to move for a new trial or to move for judgment notwithstanding the verdict (JNOV), failing to argue the *Weathersby* rule, and failing to subpoena eyewitnesses to testify at trial.

[3] Desiree Smith was also referred to as Desiree Dempsey in the record. This Court will use her first name to identify her.

2

found. Townsend and Jones told Investigator Sims that Ford had shot and killed Bolin. Ford was arrested and taken to the police station to be interviewed. Ford voluntarily waived his *Miranda*[4] rights and told Investigators Sims and McMillan that he killed Bolin in self defense.

¶4. Ford was indicted by a Leake County grand jury for first-degree murder pursuant to Mississippi Code Annotated 97-3-19(1)(a) (Supp. 2017). Ford's criminal trial began on January 21, 2020. The State called seven witnesses. Officer Gill was the first witness to testify. Officer Gill testified that he and Officer Horne were the first officers to arrive at the mobile home on July 21, 2018. When they went into the mobile home, they discovered Bolin's body and noticed the gunshot wound to her abdomen. Officer Gill testified that it looked like Bolin had been left there for a number of hours because the blood around her was dry. Officer Gill testified that there was also a towel "that had been wrapped around [her] head prior to [the officers'] arrival." It was later discovered that Bolin had suffered a second gunshot wound to her head. Officer Gill stated that he called Leake County Sheriff's Office Investigator Sims and Investigator McMillan to the residence to begin the investigation and to collect evidence. Officer Gill testified that he searched a white sports utility vehicle (SUV) that was on the premises. During his search he found two firearms: a .45-caliber revolver and a 9-millimeter revolver. Officer Gill stated that Jones and Townsend both arrived on the scene after the officers arrived and gave witness statements to Investigator Sims.

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶5.    Investigator Billy McMillan was the second witness called to testify.  He explained that he arrived on the scene and began collecting evidence.  Investigator McMillan testified that he collected two firearms, a .45-caliber revolver and a 9-millimeter gun, and a "projectile found on the floor near [Bolin's] feet."  Investigator McMillan also testified that he found two cell phones and a box of .45-caliber revolver ammunition in the white SUV.  Investigator McMillan testified that the .45-caliber revolver could hold five rounds.  The .45-caliber revolver found at the crime scene had three "unshot rounds."  The revolver also had two .45-caliber casings of two bullets that had been fired from the gun.  Investigator McMillan testified that he observed two gunshot wounds to Bolin's body, one to the abdomen and one to the head.  Before Investigator McMillan could be cross-examined, Ford's counsel informed the court, "Your Honor . . . I think [Ford] wants permission to be able to cross-examine witnesses himself."  The Court responded, "Well, he has that right if he wants to do so."[5]

¶6.    After this exchange, the court recessed for lunch.  After lunch, Ford's desire to question witnesses was not discussed further.  The court simply asked if Ford's attorney had "any cross-examination . . . ."  Ford's attorney responded, "Yes, sir, briefly," and he began his cross-examination of Investigator McMillan.  Ford said nothing.  On cross-examination, Investigator McMillan testified that his main objective upon arriving to the crime scene was to gather and secure all the physical evidence while Investigator Sims took witness statements.  Neither Ford nor his counsel ever asked the court to let Ford question witnesses

---

[5] The entire on-the-record discussion on this point will be addressed in full in the analysis.

again. Instead, Ford's attorney continued his representation of Ford by cross-examining the State's witnesses. He also objected to testimony and evidence and made the closing argument.

¶7.    Katina Townsend testified as the State's third witness. She testified that she saw Ford kill Bolin. Townsend also testified that she was taken to Jones' residence against her will days before Ford shot Bolin. Townsend stated that Bolin came to her aunt's home with a gun and forced Townsend to leave with her. Townsend was brought to Jones' home and spent the next few days with Bolin, Ford, Jones, Desiree, and Tim Flowers.[6] Townsend testified that Ford and Bolin arrived at Jones' house together. According to Townsend, Bolin had been doing drugs while launching threats and pointing her gun at everyone in the mobile home. She also stated that Ford and Bolin had been arguing all night before the shooting. On the night of Bolin's death, Townsend saw Bolin threaten Ford. She also saw Bolin swing her gun at Ford. Townsend testified that after Bolin threatened Ford, Bolin laid her gun down on the armrest of the couch she and Ford were sitting on and started doing "a line of dope." Ford grabbed the gun from the armrest. Townsend testified that after Ford grabbed the gun, he and Bolin got into a "tusslement." Townsend tried to leave the room when the fight began, but she heard a gunshot before she could leave. Townsend immediately hid to protect herself. Townsend testified that she heard two gunshots in total. She described the gunshots as a "boom and then a pause and then another shot." Townsend said that Ford was only "ten steps away" from Bolin when he fired the shots. Townsend testified that Ford had

---

[6] Flowers and Desiree were not called as witnesses by either side during the trial.

time to leave after he grabbed the gun and added that Ford had a right to fear for his life.

¶8.     Townsend also testified to the events that occurred immediately after Ford shot Bolin. Townsend stated that after Ford shot Bolin, he "stood there for a minute." Then Ford and Jones went outside and had a "shoot out." After the "shoot out," Townsend, Ford, and Jones drove away in Bolin's white SUV to pick up more drugs. Jones was driving the SUV while Ford sat in the front passenger seat, and Townsend sat in the back. Townsend testified that no one spoke about what happened to Bolin during the car ride, and after about fifteen to twenty minutes of driving, they returned to the mobile home. Townsend testified that when they arrived back at the mobile home, Desiree and Flowers got into the SUV. Once they were all in the vehicle they began "trying to figure out what to do next." Townsend stated, "Chris had mentioned doing something to me because I was going to be the one to tell it all."

¶9.     Chris Jones was also an eyewitness to the shooting of Bolin. Jones testified that he resided at the address where Bolin was shot. Jones testified, "I physically lived in the brick house. But I had a little play house on the other end." Jones stated that he, Bolin, Ford, Townsend, Desiree, and Flowers had been at his mobile home for days "doing dope." Bolin would leave the mobile home and go to work, but she would return. Jones testified that Bolin told him she wanted to kill Townsend because she believed Townsend was a police officer, and she wanted to kill Desiree because Desiree did not like her. Jones told Ford he would need to try to calm Bolin down because Bolin was Ford's friend. Jones stated Bolin was mad at Ford for not allowing her to harm Townsend or Desiree. According to Jones, on the night of Bolin's death, she had threatened everyone in the mobile home and had announced that

6

someone was dying that night. Jones also saw Bolin threaten Ford and Townsend. Jones said that Bolin told Ford she was going to kill him. Jones stated he was "standing at the door leaning outside the door when [he] heard the gunshot." Jones testified that Bolin placed her gun on a couch's armrest before sitting down to do a line of dope with Ford. When Bolin got up to get a beer from the refrigerator, Ford grabbed her gun. Bolin turned around and said, "Oh–oh, shit." Then Jones heard a gunshot. "When I heard the gunshot, I just turned around and I seen her on the floor." Jones saw Bolin coming toward Ford, but she was falling. Jones testified that Ford had no time to escape after he grabbed the gun because Bolin "rushed at him." When the gun was fired, Jones said Bolin was "right up on" Ford.

¶10.    Investigator Justin Sims testified about the interview he conducted with Ford. The interview occurred at the Leake County Sheriff's Office on the night of the shooting. Ford provided a verbal statement about what occurred on the night of the shooting, but Ford did not put it in writing. Ford's attorney asked that the statement be suppressed and not admitted into evidence. The court asked the jury to leave the courtroom and conducted a suppression hearing to determine the admissibility of Investigator Sims' summary of Ford's statement. The State argued Investigator Sims' testimony was admissible because Ford properly waived his *Miranda* rights. The State provided the waiver form Ford had signed. The State also provided testimony from Investigators Sims and McMillan about whether Ford was given the opportunity to write his statement. During the suppression hearing, both investigators testified that they offered Ford the chance to write his statement, and he declined. Ford's attorney argued that Ford's verbal statement was inadmissible because Ford was never given

7

the chance to write his statement down.

¶11.    Ford also testified at the suppression hearing.  Ford admitted he was read his *Miranda* rights and signed the *Miranda* rights waiver form.  He testified that he was never given an opportunity to write his statement down.  Ford stated that when he asked Investigator Sims if he could write his statement down, Investigator Sims told him, "Ain't no need for none of that."  Ford's attorney read Investigator Sims' summary of Ford's statement to Ford and asked Ford, "Is that what was said?"  Ford responded, "No, sir."  Ford's attorney asked Ford to explain what happened when Investigator Sims and Investigator McMillan questioned him about shooting Bolin.  Ford testified, "I tell [Investigator Sims] what happened, and then he said – he try to act like, 'Oh so he did this and you did that?' I'm telling him, 'No.  It happened like this.' And so the whole time, we arguing back and forth."  The trial court ultimately determined that Investigator Sims' report of Ford's verbal confession was admissible and allowed Investigator Sims to continue to testify about the statement to the jury.

¶12.    When the jury returned to the courtroom, Investigator Sims testified about the statement Ford gave him after Ford was arrested and taken to the Leake County Sheriff's Office.  Investigator Sims read his summary of Ford's verbal statement to the jury:

> He was scared that [Bolin] was going to kill him. . . . He told investigators that she had been threatening to shoot him all night long.  He said they were sitting at a – they were sitting in the kitchen.  She laid the gun down on the table while she was doing dope.  He then stated he jumped up, grabbed her gun, and went at her.  They got to fighting over the gun.  He shot her in the stomach and head. [Ford] stated to investigators that he did what he did because he was scared she was going to kill him.

8

Investigator Sims testified that there is no recording device in the interview room when potential suspects are being questioned. Instead, detailed notes are taken. Investigator Sims stated that he makes his reports after the interviews and relies on his memory and notes to accurately recount what he was told in the interview room.

¶13. On cross-examination, Investigator Sims agreed that he makes his reports "pretty shortly after" he has spoken with potential suspects. Investigator Sims testified that he took written witness statements from Townsend, Jones, and Desiree. Investigator Sims stated that Ford did not want to write his statement down. Investigator Sims was questioned about whether he interviewed Flowers that day. Investigator Sims answered, "I don't know anything about a Timothy Flowers." Investigator Sims testified that Flowers was not someone he knew was at the crime scene on July 21, 2018.

¶14. Dr. Mark LeVaughn, the Chief Medical Examiner for Mississippi, testified about the autopsy performed on Bolin on July 23, 2018. The findings of the autopsy revealed Bolin suffered two gunshot wounds: one to the abdomen and one to the head. The first gunshot wound was to the abdomen. It was made from close range, no more than a "foot away," but it was not incapacitating. The second gunshot wound was a "contact wound" to Bolin's forehead, meaning the barrel of the gun was pressed to Bolin's forehead when the firearm was discharged. According to Dr. LeVaughn, it was instantly incapacitating. Dr. LeVaughn testified that the gunshot wound to the head took a slightly "downward path."

¶15. Finally, Mark Boackle testified for the State as an expert witness. He was properly qualified as an expert witness for firearms examination and comparison. Boackle testified

9

that he received two projectiles and two firearms related to Bolin's shooting, and he was asked to classify them. One of the projectiles was a bullet taken from Bolin's hip after her autopsy. Boackle determined that the two projectiles he was sent were not fired from the 9-millimeter gun that was found in Bolin's SUV. Boackle said that both projectiles were too damaged to determine if they were fired from the same gun, but he did confirm that they were both shot from a .45-caliber revolver like the one found in Bolin's SUV.

¶16. After Boackle's testimony, the State rested. Ford did not call any witness to testify in his behalf. The jury ultimately convicted Ford of first-degree murder pursuant to Mississippi Code Annotated section 97-3-19(1)(a).[7] Ford appealed.

## ANALYSIS

### I. The *Weathersby* Rule is not applicable to Ford's case.

¶17. Ford first argues that the trial court erred under the *Weathersby* rule by not granting him a directed verdict of not guilty. Motions for directed verdict are reviewed de novo. *Jones v. State*, 154 So. 3d 872, 878 (¶15) (Miss. 2014). The *Weathersby* rule states:

> [W]here the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, **unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts** or by the facts of common knowledge.

*Weathersby v. State*, 165 Miss. 207, 147 So. 481, 482 (1933) (emphasis added). The *Weathersby* rule is "alive and well and living in the courtrooms of this [S]tate." *Johnson v. State*, 987 So. 2d 420, 424 (¶10) (Miss. 2008) (quoting *Heidel v. State*, 587 So. 2d 835, 839

---

[7] Ford's attorney did not file any post-trial motions, including motions for a new trial or JNOV.

(Miss. 1991)). Where the facts warrant the application of *Weathersby*, the rule becomes "efficacious." *Id.* (quoting *Dew v. State*, 309 So. 2d 857, 857 (Miss. 1975)). Further, when the *Weathersby* rule is applicable and the "defendant's version affords an absolute legal defense, the defendant is entitled to a directed verdict of acquittal." *Id.* (quoting *Green v. State*, 631 So. 2d 167, 174 (Miss. 1994)).

¶18. Ford did not raise the *Weathersby* rule as a basis of acquittal during his motion for a directed verdict or any post-trial motions. When the *Weathersby* rule is not mentioned during either a directed verdict motion or in a post-trial motion for JNOV, the issue is procedurally barred. *Jones*, 154 So. 3d at 877 (¶15); *see also Page v. State*, 64 So. 3d 482, 489 (¶29) (Miss. 2011) (holding that a defendant's failure to raise the *Weathersby* rule as a defense at trial procedurally barred Page from raising it on appeal); *Brown v. State*, 33 So. 3d 1134, 1141 (¶27) (Miss. Ct. App. 2009) (explaining that a defendant was "procedurally barred from bringing his *Weathersby* argument because he did not bring it to the trial court's attention and give the trial court the opportunity to make a ruling"); *Neese v. State*, 993 So. 2d 837, 843 (¶12) (Miss. Ct. App. 2008) (concluding that a defendant was procedurally barred from raising the *Weathersby* rule on appeal because he failed to mention it in his post-trial motions). Thus, because Ford did not raise the *Weathersby* rule during his trial or in a post-trial motion, he is procedurally barred from raising it on appeal.

¶19. Even without the procedural bar, the *Weathersby* rule does not apply to Ford's case because Ford's version of events is "contradicted in material particulars by a credible witness or witnesses for the state" and "by the physical facts." *See Weathersby*, 147 So. at 482. The

11

defendant and two eyewitnesses gave similar statements about Bolin's anger and the threats she made. Ford, Townsend, and Jones all stated that Bolin was angry on the night of her death and that she was particularly mad at Ford. Townsend testified that she saw Bolin swing her gun at Ford. She also testified that Bolin had been making threats and pointing her gun at everyone in the mobile home. Jones testified that Bolin said she wanted to harm Townsend and Desiree, so he told Ford to calm Bolin down because Bolin and Ford were friends. Jones testified that Bolin was mad at Ford for telling her she could not harm anyone. Jones also testified he heard Bolin tell Ford that she was going to kill him. Ford told law enforcement that Bolin had been "threatening to shoot him all night long."

¶20.    The remaining details about the night Ford shot Bolin differ. Townsend testified that on the night of Bolin's death, Bolin and Ford were sitting on the couch "doing a line of dope." Townsend testified that Bolin placed her gun on the couch's armrest when she sat next to Ford to do the "line of dope." Jones testified that Bolin sat her gun on the armrest of a couch and started to take drugs with Ford. However, Ford told law enforcement that he and Bolin were sitting in the kitchen, and "[s]he laid the gun down on the table while she was doing dope."

¶21.    Townsend also testified that after Bolin sat her gun down on the couch's armrest, Ford grabbed the gun, and the two began fighting. Townsend testified that she heard two gun shots. Jones testified that after Bolin sat down on the couch and did a line of "dope" with Ford, she got up and walked to the refrigerator to get a beer. When Bolin walked to the refrigerator, Ford "jumped across the living room to the love seat and grabbed the gun."

12

Jones testified that Bolin turned around, said "Oh–oh, shit," and Ford shot her. Jones only heard one gunshot. Jones testified that after Ford shot Bolin, she fell toward Ford. Ford told law enforcement that after Bolin laid her gun down on the kitchen table, he "jumped up, grabbed her gun, and went at her." Ford told law enforcement that they fought over the gun, and then he shot Bolin in the stomach and in the head.

¶22. Townsend and Jones also had differing accounts about whether Ford had time to leave the mobile home after he grabbed Bolin's gun. Townsend agreed that Ford had time to leave after getting Bolin's gun. The prosecutor asked her, "[O]nce he got the gun, could he have just left and nothing ever happened? He had the gun at that point." Townsend responded, "Right." However, Jones testified that Ford had no time to escape once he grabbed Bolin's gun. The prosecutor asked Jones, "Once Mr. Ford got the gun in his hands, did he try to leave once he had the gun?" Jones responded, "[W]hen he got the gun off the couch, she rushed at him, and he–he shot her. He ain't had no – there wasn't no time for him to try to leave. He couldn't avoid it."

¶23. Finally, Townsend, Jones, and Dr. LeVaughn testified about where Ford was standing and where Bolin was standing when the two shots were fired. Townsend testified that Ford was "ten steps away" from Bolin when he fired the shots. Jones testified that Bolin was "right up on" Ford when he shot her. Dr. LeVaughn testified that the first gunshot came from "less than a foot away." He testified that the second gunshot was a contact wound, meaning the barrel of the gun was on Bolin's forehead when Ford fired the gun.

¶24. "*Weathersby* . . . is nothing more than a particularized version of our general standards

13

according to which courts must decide whether in a criminal prosecution the accused is entitled to a judgment of acquittal as a matter of law." *Jones*, 154 So. 3d at 878 (¶17) (quoting *Johnson*, 987 So. 2d at 425 (¶10)). "When considering a motion for directed verdict, all evidence introduced by the State must be accepted as true, together with all reasonable inferences therefrom. If there is sufficient evidence to support a guilty verdict, the motion for directed verdict must be overruled." *Id*. (quoting *Green v. State*, 631 So. 2d 167, 175 (Miss. 1994)). Because the State has presented evidence that substantially contradicted material particulars of Ford's statement to law enforcement through credible witnesses and physical facts, *Weathersby* did not apply to this case, and Ford was not entitled to a directed verdict of acquittal.

## II. Ford did not make a request to represent himself at trial.

¶25. Ford argues that he is entitled to a new trial because the trial court refused to allow him to represent himself. The United States Constitution and Mississippi Constitution give a defendant the right to waive his assistance of counsel and represent himself. *Coleman v. State*, 914 So. 2d 1254, 1255 (¶4) (Miss. Ct. App. 2005). A defendant's right to represent himself at trial is a constitutional guarantee, so this Court will review alleged violations of a defendant's right to self-representation de novo. *Williams v. State*, 296 So. 3d 711, 717 (¶17) (Miss. Ct. App. 2019).

¶26. Ford argues that the trial court violated his constitutional right to self representation by denying him the opportunity to represent himself. Ford cites Mississippi Rule of Criminal Procedure 7.1(c) to show that trial courts are required to conduct an on-the-record

14

examination of a defendant when he expresses a desire to represent himself. Rule 7.1(c) states, "When the court learns that a defendant desires to act as his/her own attorney, the court shall conduct an on-the-record examination of the defendant to determine if the defendant knowingly and voluntarily desires to act as his/her own attorney." MRCrP 7.1(c). Ford argues that his attorney made the trial court aware of Ford's desire to represent himself after the direct examination of Investigator McMillan.

¶27.    Ford cites the dialogue between his attorney and the court to show that the trial court was properly made aware of Ford's desire to represent himself. During the testimony of the States' second witness, Investigator McMillan, the following discussion occurred:

Mr. Harris:    Okay. Your Honor, my client desires – he and I are having a – my client and myself are having a difference of opinion about questions that we need to ask witnesses. He's insistent that I ask some questions that I believe are irrelevant. Some of them are admissible. Some of them could lead to admission of evidence that is – would not normally be admissible in the case. Some of them could be very damaging to his case. And he's insistent that I ask these questions which I'm not willing to do so, and therefore, he wants to ask the questions, **Your Honor . . . I think he wants permission to be able to cross-examine witnesses himself.**

**The Court:    Well, he has that right if he wants to do so.**

Mr. Harris:    Okay. So–

The Court:    But I would caution you, Mr. Ford, to listen to the advice of your lawyer. You are free to represent yourself and act as your own lawyer if you do so, but I would warn you that you do so at your own peril and your own risk. If you make a statement that is improper or ask a question that is improper, I'll rule accordingly. Also what you ask may lead or the things that you say may lead to evidence that is otherwise not admissible against you. You may make it become admissible against you and

15

> prejudice your case against yourself. You understand?

Ford: Yes, sir.

The Court: So if you try to do that, you are taking a risk. And so I would encourage you to – you're not a lawyer. You don't know the rules of court, and you don't know – or I assume you don't know. You may know more than I know – think you know, but my guess is, you don't know the rules of the court, and you don't know the law; certainly, not to the level that Mr. Harris does. So I would encourage you to listen to his advice. But ultimately that decision is up to you. But I would warn you that you are taking a chance that you would do more harm than good to your defense. But we'll be in recess, and you'll make those own decisions yourself. I will tell you now that I will not relax the rules just because you're not a lawyer. You'll be held to the same standard that these other three lawyers are held to.

(Emphasis added). After this conversation, the court recessed for lunch. After lunch, the court asked Ford's attorney, "Have any cross-examination, Mr. Harris?" Ford's Attorney responded, "Yes, sir, briefly." There was no further discussion about Ford's desire to cross-examine witnesses. In fact, Ford's counsel continued his cross-examination of Investigator McMillan. After Investigator McMillan, the state called the five other witnesses, and when the court asked if there was any cross-examination of each of those witnesses, defense counsel stood and conducted the cross-examination. Ford sat silently throughout the trial. Ford argues that the court's failure to resume the conversation about his desire to "represent himself" violated his constitutional rights, entitling him to a new trial.

¶28. The State argues Ford never requested to waive his right to assistance of counsel and represent himself. Instead, the State argues Ford was expressing a desire for hybrid representation. The Mississippi Supreme Court has defined hybrid representation as

16

encompassing "both the participation of the defendant in the conduct of his trial when he has not effectively waived the assistance of an attorney to defend him, and the participation by an attorney in the conduct of the trial when the defendant is defending pro se." *Metcalf v. State*, 629 So. 2d 558, 562 (Miss. 1993). The State argues that the conversation between Ford's attorney and the trial court was a request for hybrid representation and not a request for self-representation because Ford requested to ask questions his attorney refused to ask—not to exclusively represent himself. We agree.

¶29. Here, Ford merely asked the court to allow him the opportunity to ask witnesses questions on cross-examination that his attorney refused to ask. The trial court never refused Ford's request. His attorney stated, "Your Honor. . . . I think he wants permission to be able to cross-examine witnesses himself." The court responded, "Well, he has that right if he wants to do so." Ford never told the court that he wanted to represent himself. The trial court was not required to follow up on this request to ask questions. *See Lofton v. State*, 248 So. 3d 798, 808 (¶28) (Miss. 2018) (finding that because a defendant was "never left to his own defense, the trial court was not required to ensure he properly waived counsel or warn him as though he were wholly pro se"). If Ford wanted to ask questions, he could have stood up at any time during cross-examination, notified the court, and asked them. The court made it clear that Ford had a right to do that if he wanted. Instead, Ford remained silent.

¶30. Further, Ford never brought the request back to the court's attention. Instead, after lunch, Ford sat at the defense table while his attorney cross-examined Investigator McMillan. Ford also sat silently at the table while his attorney cross-examined six other witnesses,

17

argued against the admission of evidence in a suppression hearing, made objections, and gave a closing argument. Ford acquiesced to his attorney's continuing his representation by remaining silent and not objecting to his attorney's continued representation or asking if he could ask any additional questions not asked by his attorney. Therefore, this issue is without merit.

### III.    The trial court did not err in allowing Investigator Sims to testify about his summarized version of Ford's statement to law enforcement.

¶31.    Ford argues that the trial court erred by allowing Investigator Sims to testify about the summarized version of Ford's statement that he wrote after Ford's interview with law enforcement. Ford claims that Investigator Sims' written summary of his oral statement did not reflect Ford's account of what happened.

¶32.    "Extrajudicial statements by a criminal defendant, so long as the statements are relevant to the matter being tried, are admissible in evidence." *Cobb v. State*, 734 So. 2d 182, 185 (¶7) (Miss. Ct. App. 1999). In fact, "[o]nce there is credible proof that such a statement was made, evidence of the contents of the statement is admissible. The fact that the defendant denies having made the statement does not affect the threshold question of the admissibility of the purported statement." *Id.* Testimony by the defendant that he did not make a confession or that the police fabricated his or her testimony "does not constitute grounds to exclude the confession if it is contradicted by competent evidence that the statements were, in fact, made." *Id*.

¶33.    At trial, Ford's counsel objected to the admissibility of Investigator Sims' summary

18

of Ford's verbal statement. The court dismissed the jury and held a suppression hearing concerning the admissibility of Investigator Sims' testimony. At the suppression hearing, Ford argued that Investigator Sims' written summary of the verbal statement that Ford provided was inadmissible because Ford did not write it, and it did not reflect what he said. The trial court overruled the objection and allowed Investigator Sims to testify in court about the statement. Investigator Sims then read the statement to the jury.

¶34. Ford's case is similar to two other Mississippi Court of Appeals cases where this Court held that a written summary of a defendant's testimony, which had not been written by the defendant or signed by the defendant, was admissible at trial. *Cobb*, 734 So. 2d at 184-85 (¶¶5-8); *Renfrow v. State*, 34 So. 3d 617, 630-31 (¶¶41-46) (Miss. Ct. App. 2009). In *Cobb*, the defendant stole two necklaces from a jewelry store. *Cobb*, 734 So. 2d at 184 (¶2). After he was arrested, Cobb waived his right to an attorney and confessed to stealing the jewelry. *Id.* at (¶5). An investigator put Cobb's statement into writing, but Cobb refused to sign what the investigator wrote. *Id.* The trial court admitted the written statement into evidence as an exhibit based on the testimony of the investigator who wrote it. *Id.* Cobb appealed the admission of the written statement, arguing that he did not give a confession and that the written statement was fabricated by the police. *Id.* at (¶6). As noted above, this Court held, "Once there is credible proof that such a statement was made, evidence of the contents of the statement is admissible. The fact that the defendant denies having made the statement does not affect the threshold question of the admissibility of the purported statement." *Id.* at 185 (¶7).

¶35.    This Court also noted that because there was no recording of Cobb's statement to law enforcement, the officer should have testified about what Cobb told him: "The proper method of introducing Cobb's oral confession, in the absence of an actual recording in some form, would have been for the officer to relate from the stand those things that Cobb told him during the interrogation." *Id.* at (¶8).

¶36.    In *Renfrow*, two children told a counselor at the Rankin County Advocacy Center that Renfrow has shown them images of naked adults and children and touched them inappropriately. *Renfrow*, 34 So. 3d at 621-22 (¶2). Law enforcement was notified, and Renfrow's home and computer were searched. *Id.* at 622 (¶3). A year later, Renfrow came to the sheriff's office after finding a card from Investigator Gunter on his front door. *Id.* at (¶4). Renfrow waived his *Miranda* rights and told an investigator that he had child pornography on his computer. *Id.* Investigator Gunter videoed this interview, but the video had no audio. *Id.* at (¶5). Upon discovering this, he immediately wrote a summary of Renfrow's interview, and the summary was signed by the sheriff. *Id.* Renfrow was tried for possession of child pornography and touching a child inappropriately. *Id.* at 623 (¶6). Renfrow moved to suppress the summary of the statement he made to the investigator, but the trial court denied his motion. *Id.* at 631 (¶44). Renfrow was ultimately convicted, but he appealed and raised a number of issues, including the admissibility of the investigator's summary. *Id.* at 624 (¶13).

¶37.    Renfrow appealed the admission of his statement to the investigator because it was not voluntary, Renfrow did not sign it, and it was only a recollection of what Renfrow said.

*Id.* at 631 (¶44). This Court held that Renfrow's claim had no merit, and the trial court did not err in admitting the investigator's summary, even though Renfrow had not signed it. *Id.* at (¶46). "Those matters pertained to the weight and credibility of the statement, and those matters are for the jury to consider." *Id.*

¶38. Ford is similarly situated. Ford waived his *Miranda* rights before he began his interview with Investigator Sims and Investigator McMillan. Ford gave a verbal statement of what happened on July 21, 2018. Investigator Sims and Investigator McMillan both testified that no recording device or video camera was used to capture the interview. Instead, Investigator Sims took detailed notes. Immediately after the interview concluded, Investigator Sims drafted a summary of Ford's verbal statement. Investigator Sims testified to the contents of the written statement, and he testified to the statements Ford made during his interrogation. Ford argues that Investigator Sims' summary of Ford's oral statement should not have been presented to the jury because it did not reflect what he told law enforcement. We disagree.

¶39. There is credible proof that Ford made a verbal statement to law enforcement concerning what happened on July 21, 2018. Investigator Sims and Investigator McMillan testified that Ford made this statement. Ford signed a waiver of his *Miranda* rights prior to making the statement, and Ford did not deny giving a statement to law enforcement. There is credible evidence to prove that Ford made the statement, so the contents of that statement are admissible. *See Cobb*, 734 So. 2d at 185 (¶7). Ford's objection was not that he did not make a statement but that he was not allowed to write the statement himself. Both

investigators testified that Ford was offered the opportunity to write his statement, but he refused. The "weight and credibility of the statement" is a question left for the jury to decide. *See Renfrow*, 34 So. 3d at 631 (¶46). It is within the province of the jury to weigh the credibility of Investigator Sims' re-telling of Ford's oral statement. For these reasons, we find that the trial court did not err by allowing Investigator Sims to read his summary of Ford's verbal statement to the jury.

## IV. Ford's counsel was constitutionally effective.

¶40. Ford argues that his counsel was constitutionally ineffective for four reasons: (1) failing to propose a "stand your ground" jury instruction; (2) failing to file motions for a new trial or JNOV; (3) failing to argue the *Weathersby* rule and moving for a directed verdict of acquittal; and (4) failing to subpoena eyewitnesses to testify at trial.

¶41. Ineffective-assistance-of-counsel claims generally are reserved for post-conviction relief. *Ross v. State*, 288 So. 3d 317, 324 (¶29) (Miss. 2020) (quoting *Bell v. State*, 202 So. 3d 1239, 1242 (¶12) (Miss. 2016)). These claims are addressed on direct appeal when "[1] the record affirmatively shows ineffectiveness of constitutional dimensions, or [2] the parties stipulate that the record is adequate and the Court determines that the finding of facts by a trial judge able to consider the demeanor of the witnesses, etc., are not needed." *Id*. Ineffective assistance of counsel claims will also be reviewed on direct appeal "when the record affirmatively shows the claims are without merit. *Id.* After review of the record, this Court finds the record to be sufficient to decide Ford's claims of ineffective assistance of counsel because Ford has failed to show any alleged deficient performance that prejudiced

22

his defense.

¶42.    A claim of constitutionally ineffective assistance of counsel is reviewed de novo. *Taylor v. State*, 167 So. 3d 1143, 1146 (¶5) (Miss. 2015).  Counsel's performance will be deemed ineffective if the defendant can satisfy a two-prong test. *Jackson v. State*, 815 So. 2d 1196, 1200 (¶8) (Miss. 2002).   The defendant must show that (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  This Court will look at the "totality of the circumstances to determine whether counsel's efforts were both deficient and prejudicial. There is a strong but rebuttable presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Henderson v. State*, 281 So. 3d 1058, 1063 (¶16) (Miss. Ct. App. 2019) (quoting *Dartez v. State*, 177 So. 3d 420, 423 (¶19) (Miss. 2015)).

### a.    Ford's counsel was not ineffective for failing to propose a "stand your ground" jury instruction.

¶43.    Ford first argues that his counsel's failure to propose a "stand your ground" jury instruction constituted ineffective assistance of counsel. Decisions made by defense counsel are presumed strategic, and the court will not second-guess counsel's strategic decisions. *Shinn v. State*, 174 So. 3d 961, 966 (¶12) (Miss. Ct. App. 2015).  In fact, the Mississippi Supreme Court has characterized an attorney's decision to request or not to request a jury instruction as trial strategy.  *McCoy v. State*, 147 So. 3d 333, 347 (¶36) (Miss. 2014).

¶44.    A "stand your ground" jury instruction is based on Mississippi Code Annotated section 97-3-15(4)(Rev. 2020), which defines justifiable homicide.  That section states:

> A person who is **not the initial aggressor** and **is not engaged in unlawful activity shall** have **no duty to retreat before using deadly force** under subsection (1)(e) or (f) of this section if the person is in a place where the person has a right to be, and no finder of fact shall be permitted to consider the person's failure to retreat as evidence that the person's use of force was unnecessary, excessive or unreasonable.

(Emphasis added). If the defendant can show that he was "in a place where he had the right to be and was not the immediate provoker and aggressor, he may stand his ground without losing his right to self-defense." *Newell v. State*, 49 So. 3d 66, 75 (¶23) (Miss. 2010). Ford argues he was entitled to this jury instruction, and his counsel was ineffective for failing to request it.

¶45. Ford argues his case is similar to *McNeer v. State*, where this Court reversed a second-degree murder conviction because the trial court failed to give two jury instructions, including a "stand your ground" jury instruction. *McNeer v. State*, 307 So. 3d 508, 516 (¶24) (Miss. Ct. App. 2020). However, *McNeer* is distinguishable from Ford's case and does not apply.

¶46. McNeer was tried and convicted for the murder of Robert Little. *Id.* at 510 (¶1). McNeer did not deny shooting Little, but McNeer said he did it to protect his family. *Id.* at (¶3). Little had been staying with McNeer and his family at the McNeer family home. *Id.* McNeer suspected Little of stealing items from his family, including one of McNeer's guns. *Id.* McNeer said Little had been talking about killing and stealing, which made McNeer nervous. *Id.* When it was discovered that Little had stolen additional items from the McNeer home, McNeer decided Little could no longer stay at the residence. *Id.* The morning of the shooting, McNeer armed himself with a gun before talking to Little about leaving his

24

residence because the two had previously fought. *Id.* at 512 (¶7). When McNeer told Little to leave, Little "looked at him with the 'coldest, deadliest' stare." *Id.* at 511 (¶3). McNeer said he was scared and knew he could not fight Little off if Little attacked him. *Id.*

¶47. McNeer and his son both testified that Little began staring at McNeer in a way that made them realize Little was going to harm McNeer. *Id.* at 512 (¶9). McNeer activated the laser of his gun, and Little placed his head in the laser's path. *Id.* Then, Little leaped to his feet and started to approach McNeer. *Id.* McNeer remained seated and shot Little in the chest one time. *Id.* McNeer's fiancee called 911, and his son grabbed a towel to place on Little's chest. *Id.* McNeer was convicted of second-degree murder. *Id.* at (¶10).

¶48. McNeer appealed his conviction, arguing he should have been given a stand your ground jury instruction. *Id.* at (¶11). This Court found that the trial court erred in unilaterally determining that McNeer was the initial aggressor thus eliminating the need for a "stand your ground" jury instruction. *Id.* at 516 (¶23). This Court found that determining who was the initial aggressor was a question for the jury because McNeer had presented enough evidence to question whether the initial aggressor was McNeer or Little. *Id.* The Court noted that McNeer was in a "place he had every right to be and was not engaged in criminal activity by asking Little to leave his home." *Id.*

¶49. Unlike *McNeer*, Ford shot Bolin in someone else's home. In addition, Ford, Bolin, and the others in the home were engaged in criminal activity. Ford is similar to *McNeer* in that there is arguably a question of whether Ford or Bolin was the initial aggressor. However, unlike in *McNeer*, "stand your ground" was not the primary defense theory used

25

at Ford's trial. Rather, Ford's counsel relied on a self-defense theory. In *Henderson v. State*, this Court held that counsel was not constitutionally ineffective for failing to request a "stand your ground" jury instruction when the primary defense at trial was purely self-defense, and the defendant received a self-defense jury instruction. *Henderson v. State*, 281 So. 3d 1058, 1064 (¶19) (Miss. Ct. App. 2019). Ford's counsel did not propose a "stand your ground" jury instruction, but Ford was given a self-defense jury instruction.

¶50. After review, we find that counsel's decision not to request a "stand your ground" jury instruction at Ford's trial falls within the realm of trial strategy. Counsel could have easily not asked for a "stand your ground" jury instruction because he did not want the jury considering self-defense (an instruction Ford received) with another type of self-defense instruction, which required an evaluation as to who was the initial aggressor and if there was criminal activity. This Court will not second guess an attorney's strategic decisions. *See Shinn*, 174 So. 3d at 966 (¶12). Because counsel's decision not to request a "stand your ground" jury instruction appears strategic, Ford fails the first prong of *Strickland*. Thus, Ford has not shown his counsel's performance was deficient. Therefore, Ford's counsel was not constitutionally ineffective for failing to request a "stand your ground" jury instruction.

### b. Ford's counsel was not constitutionally ineffective for failing to file a motion for a new trial or JNOV.

¶51. Ford argues that his counsel's failure to file a motion for a new trial or JNOV rendered his counsel's assistance constitutionally ineffective. The Mississippi Supreme Court has held that an attorney's failure to file post-trial motions challenging the weight and sufficiency of the evidence is deficient, satisfying the first prong of *Strickland*. *See Parker v. State*, 30 So.

3d 1222, 1235 (¶48) (Miss. 2010) ("[T]he failure to file a motion for a new trial constituted a deficient performance under prong one of *Strickland*, since the trial judge did not have an opportunity to reconsider whether the verdict was contrary to the overwhelming weight of the evidence."); *Pace v. State*, 242 So. 3d 107, 118 (¶31) (Miss. 2018) (Pace's counsel was deficient in failing to file post-trial motions challenging the weight and sufficiency of the evidence presented at trial.); *Giles v. State*, 187 So. 3d 116, 125 (¶33) (Miss. 2016) ("Giles's trial counsel rendered deficient performance by failing to make any post-trial challenges to the weight or sufficiency of the evidence."); *Holland v. State*, 656 So. 2d 1192, 1197-98 (Miss. 1995) (finding counsel's performance to be deficient for failing to file motions challenging the weight and sufficiency of the evidence). The Mississippi Supreme Court and this Court have relied on *Pace*, *Parker*, *Giles*, and *Holland* to determine if counsel's failure to file post-trial motions was constitutionally ineffective.

¶52.    As previously stated, Ford's counsel failed to make any post-trial motions for a new trial or JNOV. Counsel's failure to file those motions is deficient because the trial judge was not given the opportunity to "reconsider whether the verdict was contrary to the overwhelming weight of the evidence" or the sufficiency of the evidence. *Parker*, 30 So. 3d at 1235 (¶48); *see also Pace*, 242 So. 3d at 118 (¶31); *Holland*, 656 So. 2d at 1197-98; *Giles*, 187 So. 3d at 125 (¶33). Therefore the first prong of *Strickland* is satisfied. However, Ford must also show that his counsel's deficient performance was prejudicial to his defense. For counsel's deficient performance to be prejudicial, "counsel's errors [must be] so serious as to deprive the defendant of a fair trial." *Strickland*, 466 U.S. at 687. In other words, there

27

must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the trial would have been different." *Evans v. State*, 294 So. 3d 1152, 1158 (¶10) (Miss. 2020) (quoting *Ross v. State*, 954 So. 2d 968, 1003-04 (¶78) (Miss. 2007)).

¶53. Counsel's deficient performance in failing to file post-trial motions does not necessarily mean the defendant was prejudiced by the failure. In *Parker v. State*, the Mississippi Supreme Court found that Parker successfully showed that his attorney's failure to file post-trial motions was deficient performance, but Parker was not able to show that the failure prejudiced his defense. *Parker*, 30 So. 3d at 1235 (¶49). Specifically, the court found that there was "no reasonable probability that the trial judge would have granted the motion for a new trial had he been afforded a second chance to review the evidence . . . ." *Id.* Both *Pace* and *Giles* resulted in similar decisions. In *Pace*, the Mississippi Supreme Court found that counsel's deficient performance of failing to file post-trial motion did not prejudice Pace's defense because there was "no reasonable probability that either motion would have been granted." *Pace*, 242 So. 3d at 118 (¶31). In *Giles*, the court found that Giles' attorney's performance was deficient but counsel's failure was not prejudicial because there was "no reasonable probability that a trial court would have granted a motion for a directed verdict, a peremptory instruction, or a [JNOV]." *Giles*, 187 So. 3d at 125-26 (¶32).

¶54. The decision in *Holland* was different. The court found that Holland's counsel was ineffective because counsel's performance was deficient, and counsel's deficiency prejudiced Holland. *Holland*, 656 So. 2d at 1198. First, the court found that counsel was deficient for failing to make post-trial motions. *Id.* at 1197. The court also found that counsel's failure

28

prejudiced Holland because of a reasonable probability that the outcome would have been different. *Id.* at 1198. The court found that the evidence relied on by the State to convict Holland was insufficient, so there was a "reasonable probability that the trial judge would have granted the renewed motion for a [JNOV] or a peremptory instruction had he been afforded a second chance to review the evidence produced at trial." *Id.* Here, to satisfy the second prong of *Strickland*, Ford must show that there was a "reasonable probability" that the trial judge would have granted a new trial or JNOV had his counsel filed the post-trial motions.

¶55. A motion for JNOV challenges the sufficiency of the evidence presented to the jury at trial. *Russell v. State*, 296 So. 3d 217, 223 (¶16) (Miss. Ct. App. 2020). Sufficiency-of-the-evidence claims are reviewed de novo. *Sanford v. State*, 247 So. 3d 1242, 1244 (¶10) (Miss. 2018). When reviewing a sufficiency of the evidence claim, "[t]he relevant question is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Hearn v. State*, 3 So. 3d 722, 740 (¶54) (Miss. 2008)). The evidence is viewed in a light most favorable to the State. *Martin v. State*, 214 So. 3d 217, 222 (¶7) (Miss. 2017). The State is also given all favorable inferences that can be drawn from the evidence. *Henley v. State*, 136 So. 3d 413, 415 (¶8) (Miss. 2014). If the court finds that a reasonable trier of fact could review all the evidence and find each essential element of a crime to be proven beyond a reasonable doubt, the court is bound to uphold the jury's verdict. *Ronk v. State*, 172 So. 3d 1112, 1129 (¶3) (Miss. 2015).

¶56. Ford was convicted of first-degree murder pursuant to Mississippi Code Annotated

section 97-3-19(1)(a). That section states that "the killing of a human being without the authority of law by any means or in any manner . . . [w]hen done with deliberate design to effect the death of the person killed, or of any human being, shall be first-degree murder[.]" Miss. Code Ann. § 97-3-19(1)(a).

¶57. At Ford's trial, the State called two eyewitnesses to testify about what happened the morning of Bolin's death. Townsend testified that Bolin had threatened everyone in the mobile home. She also said that Ford and Bolin had been arguing. Townsend testified that Bolin had swung her gun at Ford but did not hit Ford. When Bolin and Ford sat down to do a line of dope, Ford grabbed Bolin's gun. Ford and Bolin began fighting. Townsend heard two gunshots. She described the sound as a "boom and then a pause and then another shot." Townsend also testified that immediately after the shooting, Ford and Jones had a "shoot out." Then, she, Jones, and Ford drove away in Bolin's white SUV to get more drugs. Townsend testified that after fifteen minutes of driving, the three of them came back to the mobile home to pick up Desiree and Flowers and "figure out what to do next."

¶58. Jones testified that Bolin was threatening to harm Townsend and Desiree. Jones told Ford to calm Bolin down because Bolin was Ford's friend. Bolin got mad at Ford for telling her not to harm anyone. Jones said he heard Bolin say she would kill Ford. Jones also heard Bolin threaten everyone in the mobile home and announce that someone was going to die. Jones testified that Bolin and Ford were sitting on a couch doing a line of dope when Bolin got up and walked to the refrigerator for a beer. Ford grabbed Bolin's gun, and Bolin turned around from the refrigerator. She said "Oh–oh, shit," and Ford shot her in the abdomen.

30

Jones said that after Ford shot Bolin, she began falling toward Ford. Jones testified that he was leaning outside the door of the mobile home was fired when the first gunshot. Once he heard the first gunshot, he turned around and saw Bolin on the floor. Jones testified that he never heard a second gunshot.

¶59. The State also called Investigator Sims to the stand to testify about Ford's statement to law enforcement. Investigator Sims provided his summary of Ford's statement. He stated that Ford told law enforcement he was scared Bolin was going to kill him, and she had been threatening to shoot him the night before the shooting. When Ford and Bolin were doing drugs together in the kitchen, Ford grabbed her gun from the table, and "went at" Bolin. The two fought, and Ford shot Bolin twice to protect himself.

¶60. The jury also heard from Dr. LeVaughn, who testified about the autopsy report of Bolin. Dr. LeVaughn testified that Bolin suffered two gunshot wounds: one to the abdomen and one to the head. The one to the abdomen was shot from less than a foot away and was not instantly incapacitating. The gunshot wound to the head was a contact wound, shot at a slightly downward angle, and it was instantly incapacitating.

¶61. The State also called Officer Gill to testify about what he saw when he and Officer Horne were called to the residence on the morning of July 21, 2018. Officer Gill said that when he and Officer Horne walked into the mobile home, they saw Bolin's body on the floor. He noted a bullet wound to her abdomen. Officer Gill also noticed that the blood around Bolin was dry, which led him to conclude that Bolin's body had been there for a few hours. Officer Gill said that he saw a towel wrapped around Bolin's head when he arrived. Officer

31

Gill testified that a search of a white SUV on the property yielded two firearms, including a .45-caliber revolver. The jury also heard testimony from Boackle, who testified that the two projectiles recovered from the crime scene and from Bolin's body were fired from a .45-caliber revolver.

¶62. Finally, the jury saw crime-scene photographs of Bolin and the mobile home where she was found. The crime scene photographs showed Bolin's body, a towel wrapped around her head, and two gunshot wounds. The jury also saw autopsy photographs of Bolin, which included pictures of both gunshot wounds. The jury was instructed on the essential elements of first-degree murder, manslaughter, and self-defense. The jury considered and weighed all the evidence presented to it and found Ford guilty of first-degree murder. In reviewing the evidence in a light most favorable to the State, this Court finds that the State presented sufficient evidence that could lead a reasonable trier of fact to determine the State proved the essential elements of first-degree murder beyond a reasonable doubt. Therefore, Ford cannot prove his attorney's failure to file a motion for JNOV would have prejudiced his defense because there is not a "reasonable probability" that the trial judge would have granted a motion for JNOV.

¶63. Ford also argued that his attorney's failure to file a motion for a new trial constituted ineffective assistance of counsel. A motion for a new trial challenges the weight of the evidence presented at trial. *Story v. State*, 296 So. 3d 104, 115 (¶30) (Miss. Ct. App. 2019) (quoting *Woods v. State*, 242 So. 3d 47, 59 (¶51) (Miss. 2018)). As stated above, it is deficient performance for counsel not to make any post-trial motions. *Parker*, 30 So. 3d at

32

1235 (¶48); *see also Pace*, 242 So. 3d at 118 (¶31); *Holland*, 656 So. 2d at 1197-98; *Giles*, 187 So. 3d at 125 (¶33). However, Ford must prove prejudice. *Strickland*, 466 U.S. at 687 (requiring the defendant to show (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced his defense). This Court reviews challenges to the weight of the evidence by determining if the trial judge abused his or her discretion in denying a motion for a new trial. *Little v. State*, 233 So. 3d 288, 292 (¶20) (Miss. 2017). This Court will not act as a "thirteenth juror." *Id*. This Court will only disturb a verdict when "it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.* at 291 (¶21) (quoting *Lindsey v. State*, 212 So. 3d 44, 45 (¶4) (Miss. 2017).

¶64. As discussed above, the jury was presented with sufficient evidence to convict Ford of first-degree murder. The jury heard all the evidence, weighed the credibility of the witnesses, and resolved any conflicting evidence. Upon doing so, the jury found Ford guilty of first-degree murder. Reviewing the evidence in a light most favorable to the verdict, this Court finds sufficient evidence to support a first-degree murder conviction and that to allow it to stand would not "sanction an unconscionable injustice." *Id*. Therefore, there is not a reasonable probability that the trial judge would have granted a motion for a new trial if Ford's counsel had made the motion, and this issue is without merit.

c.   **Ford's counsel was not ineffective for failing to argue the *Weathersby* rule in a motion for a directed verdict.**

¶65. Ford argues that his counsel was also constitutionally ineffective for failing to move for a directed verdict and argue the *Weathersby* rule applied. As discussed above,

33

*Weathersby* is inapplicable to Ford's case. Because this Court has found that *Weathersby* was inapplicable to Ford's case, this ineffective-assistance-of-counsel claim has no merit.

¶66.    To note, it is deficient for counsel to fail to move for a directed verdict, peremptory instruction, or JNOV. *Holland*, 656 So. 2d at 1197-98. Ford's counsel did fail to move for a directed verdict pursuant to the *Weathersby* rule, satisfying the first prong of *Strickland*. However, Ford cannot show that counsel's failure to move for a directed verdict prejudiced his defense. The court in *Holland* found counsel to be ineffective because the evidence used to convict Holland was insufficient, so there was a "reasonable probability that the trial judge would have granted the renewed motion for a judgment notwithstanding the verdict or a peremptory instruction had he been afforded a second chance to review the evidence produced at trial." *Id.* at 1198. However, as discussed above, the evidence presented by the State to convict Ford was sufficient. Therefore, Ford cannot show that his counsel's failure to move for a directed verdict would have prejudiced his defense. Ford fails to establish the second prong of *Strickland.*

> **d.    Ford's counsel was not ineffective for failing to subpoena eyewitnesses to the trial.**

¶67.    Ford argues that his counsel was constitutionally ineffective for failing to subpoena two additional eyewitnesses, Flowers and Desiree, to the shooting of Bolin. "The decision not to call the remaining witnesses falls within the range of trial strategy." *Turner v. State*, 953 So. 2d 1063, 1075 (¶42) (Miss. 2007); *see also Shorter v. State*, 946 So. 2d 815, 819 (¶15) (Miss. Ct. App. 2007) ("The decision of whether or not to call a witness to the stand falls within the ambit of trial strategy."); *Renfrow v. State*, 202 So. 3d 633, 638 (¶18) (Miss.

34

Ct. App. 2016) ("[C]ounsel's choice of whether or not to . . . call certain witnesses . . . falls within the ambit of trial strategy.") (quoting *Nichols v. State*, 27 So. 3d 433, 443 (¶36) (Miss. Ct. App. 2009)). Additionally, a defendant must proffer what the witness would have testified about had he or she been called to the stand. *See Turner v. State*, 732 So. 2d 937, 951 (¶55) (Miss. 1999). When no proffer is made, the issue is waived because "there is no way for this Court to know" what the witness would say in his or her testimony. *McDowell v. State*, 984 So. 2d 1003, 1022-23 (¶78) (Miss. Ct. App. 2007).

¶68. Because counsel's decision to call or not to call witnesses falls within the ambit of trial strategy, the failure to call witnesses is not deficient performance. Ford's counsel was within the realm of trial strategy when he chose not to call two additional eyewitnesses. Investigator Sims testified to only getting a statement from Desiree. At the suppression hearing, Investigator Sims testified that he did not recall seeing Flowers at the scene: "I don't know anything about a Timothy Flowers." Ford's attorney chose not to call these two witnesses for a reason, and there is no way for this Court to know what Flowers or Desiree would have testified to because Ford failed to provide a proffer of evidence. Because Ford fails the first prong of *Strickland*, this argument is without merit.

> **V.      The State did not commit prosecutorial misconduct during closing argument.**

¶69. In his supplemental briefing, Ford raised the additional argument that the State committed prosecutorial misconduct during closing argument. Specifically, Ford states that the prosecutor "widely deviated from the facts provided" at trial. At the end of Ford's trial, the court provided instructions to the jury before closing arguments began. The trial court

35

informed the jury that "in arriving at your verdict in this case, you must not indulge in speculation, conjecture, or guesswork; that you can only act upon positive testimony introduced before you upon the witness stand; that you cannot convict the Defendant in this case upon a mere suspicion or mere conjecture . . . ." The court also told the jury that it could only convict Ford if it finds that the State proved all essential elements of first-degree murder beyond a reasonable doubt. After the jury was informed of its duty to only rely on the "positive testimony introduced before [it] upon the witness stand," closing arguments began.

¶70. The relevant parts of the State's closing argument are provided below:

> Now to be able to shoot her in the forehead at a downward angle, she ain't standing up. She's not standing up when that shot is fired. It's not – I mean, otherwise he's on his tiptoes way up here trying to shoot her in the head. If we're fighting over a gun, how am I on my tiptoes way up here trying to shoot this gun? It's at a downward angle because when he shot her in the gut, she went down. And then he got over her, and he shot her right in the head.

When reviewing claims of prosecutorial misconduct during closing argument, this Court must determine "whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Jackson v. State*, 174 So. 3d 232, 236 (¶9) (Miss. 2015). Even if a prosecutor has made an "impermissible comment," there must be a "showing of prejudice to warrant reversal." *Ambrose v. State*, 254 So. 3d 77, 129 (¶162) (Miss. 2018) (quoting *Outerbridge v. State*, 947 So. 2d 279, 286 (¶23) (Miss. 2006)).

¶71. This Court will only review a prosecutor's statement if it was "so inflammatory that the trial judge should have objected on his own motion." *O'Connor v. State*, 120 So. 3d 390, 399 (¶23) (Miss. 2013) (internal quotation marks omitted). The "court cannot control the

substance and phraseology of counsel's argument; there is nothing to authorize the court to interfere until there is either abuse, unjustified denunciation, or a statement of fact not shown in evidence." *Brown v. State*, 306 So. 3d 719, 736 (¶53) (Miss. 2020) (quoting *Grayson v. State*, 118 So. 3d 118, 139 (¶60) (Miss. 2013)). "Attorneys are allowed a wide latitude in arguing their cases to the jury." *Sheppard v. State*, 777 So. 2d 659, 661 (¶7) (Miss. 2000). "In making their argument to a jury, prosecutors **are 'entitled to argue inferences based upon evidence presented at trial**, and it is appropriate for the prosecutor to draw inferences without stating his personal opinion.'" *Johnson v. State*, 311 So. 3d 1161, 1179 (¶38) (Miss. Ct. App. 2020) (emphasis added). A closing argument is meant to "fairly sum up the evidence and point out those facts presented by the state which a prosecution contends a verdict of guilty would be proper." *Id.* (quoting *Williams v. State*, 445 So. 2d 798, 808-09 (Miss. 1984)). However, an attorney cannot "state facts which are not in evidence, and which the court does not judicially know." *Id.* Counsel also cannot "appeal to the prejudice of men by infecting prejudices not contained in some source of evidence." *Id.*

¶72.    The prosecutor in Ford's case did not commit prosecutorial misconduct in his closing argument. Rather, he argued "inferences based upon evidence presented at trial." *See Johnson*, 311 So. 3d at 1179 (¶38). Dr. LeVaughn testified that the second gunshot wound to Bolin's head was a contact wound, meaning the barrel of the gun was pressed to Bolin's forehead. He also testified that the bullet's path was at a slightly downward angle. Jones testified that Bolin was falling toward Ford after he fired the first gunshot into her abdomen. The inference the prosecutor made in his closing argument was not outside the realm of facts

37

that the evidence supported. Thus, this argument is also without merit.

## VI. The cumulative error rule does not apply.

¶73. Finally, Ford argues that his conviction should be reversed because of cumulative error. Under the cumulative error doctrine, "individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." *Varnado v. State*, 201 So. 3d 483, 490 (¶20) (Miss. Ct. App. 2015) (quoting *Ross*, 954 So. 2d at 1018 (¶138)). "However, where there is no error in part, there can be no reversible error to the whole." *Harris v. State*, 970 So. 2d 151, 157 (¶24) (Miss. 2007). Because this Court finds that Ford's other issues on appeal are without merit, there can be no cumulative error. Therefore, this issue is without merit.

## CONCLUSION

¶74. After review of the record, this Court finds the following: (1) Ford was not entitled to a directed verdict under *Weathersby* because the *Weathersby* rule was inapplicable to his case; (2) The trial court did not err by not allowing Ford to represent himself at trial because Ford did not request to exercise his right to self-representation; (3) The trial court did not err by allowing Investigator Sims to testify about the verbal statement Ford gave law enforcement about the shooting of Bolin; (4) Ford's counsel was not constitutionally ineffective for not proposing a "stand your ground" jury instruction, not filing motions for a new trial or for JNOV, not arguing the *Weathersby* rule, and not subpoenaing eyewitnesses to testify at trial; (5) the State did not commit prosecutorial misconduct in closing argument;

38

and (6) Ford's conviction should not be reversed as a result of cumulative error. Therefore, this Court affirms the Ford's conviction.

¶75. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WILSON, P.J., AND McDONALD, J., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., CONCURS IN PART AND IN THE RESULT WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD, J.; McCARTY, J., JOINS IN PART.**

**WESTBROOKS, J., CONCURRING IN PART AND IN RESULT:**

¶76. I wholly concur with the majority on Parts I, II, III, V, and VI. Regarding Part IV, I concur only in the result. I write separately to emphasize two points: (1) a defendant may be entitled to both a stand-your-ground instruction and a self-defense instruction if the evidence warrants them, and (2) the Court should make clear the legal distinction between analyzing a trial court's refusal of a jury instruction from counsel's failure to request a jury instruction.

**FACTS**

¶77. In 2018 Ford shot Bolin twice, once in the abdomen and once in the head, because she threatened to kill him, Townsend, and Desiree at Chris Jones' mobile home. Jones testified that right before the murder took place, Bolin and Ford sniffed a line of cocaine. While doing so, Bolin placed her .45-caliber revolver on the armrest of Jones' couch. Ford then grabbed the gun. At this point, Bolin reached for the gun, and they begin fighting over it. Ford told investigators that it was while they were fighting for possession of the gun that Ford shot Bolin.

**ANALYSIS**

39

## I.     Justifiable Homicide Jury Instructions

¶78.    There are three possible justifiable homicide jury instructions: (1) the stand-your-ground instruction, (2) the Castle Doctrine instruction, and (3) the self-defense instruction.  These defenses are not mutually exclusive.  If the evidence warrants, all three instructions may be given.

¶79.    All three justifiable homicide defenses have been codified, as amended in 2016, in Mississippi Annotated Code section 97-3-15 (Supp. 2016).  A stand-your-ground instruction stems from section 97-3-15(4), which provides:

> A person who is not the initial aggressor and is not engaged in unlawful activity shall have no duty to retreat before using deadly force under subsection (1)(e) or (f) of this section if the person is in a place where the person has a right to be, and no finder of fact shall be permitted to consider the person's failure to retreat as evidence that the person's use of force was unnecessary, excessive or unreasonable.

¶80.    On the other hand, the Castle Doctrine instruction is given in reference to section 97-3-15(3), which provides, in part:

> A person who uses defensive force shall be presumed to have reasonably feared imminent death or great bodily harm, or the commission of a felony upon him or another or upon his dwelling, or against a vehicle which he was occupying, or against his business or place of employment or the immediate premises of such business or place of employment, if the person against whom the defensive force was used, was in the process of unlawfully and forcibly entering, or had unlawfully and forcibly entered, a dwelling, occupied vehicle, business, place of employment or the immediate premises thereof or if that person had unlawfully removed or was attempting to unlawfully remove another against the other person's will from that dwelling, occupied vehicle, business, place of employment or the immediate premises thereof and the person who used defensive force knew or had reason to believe that the forcible entry or unlawful and forcible act was occurring or had occurred.
>
> This presumption shall not apply if the person against whom defensive force

40

was used has a right to be in or is a lawful resident or owner of the dwelling, vehicle, business, place of employment or the immediate premises thereof or is the lawful resident or owner of the dwelling, vehicle, business, place of employment or the immediate premises thereof or if the person who uses defensive force is engaged in unlawful activity or if the person is a law enforcement officer engaged in the performance of his official duties.

¶81. And a self-defense instruction results from subsections 97-3-15(1)(e) and (f):

(e) When committed by any person in resisting any attempt unlawfully to kill such person or to commit any felony upon him, or upon or in any dwelling, in any occupied vehicle, in any place of business, in any place of employment or in the immediate premises thereof in which such person shall be;

(f) When committed in the lawful defense of one's own person or any other human being, where there shall be reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished[.]

¶82. The facts may warrant that all three jury instructions be given. As exemplified in

*Bernard v. State*, 288 So. 3d 301 (Miss. 2019), the trial court found that the defendant was

entitled to both a self-defense instruction and a Castle Doctrine instruction.[8] *Bernard*, 288

So. 3d at 313 (¶45). Bernard, the defendant, was a passenger in Brittany Wells' car when she

pulled into a parking complex and yelled at a driver for driving in the wrong direction. *Id*.

at (¶5). The driver, Larry Johnson, got out of his car and yelled back. *Id*. at (¶6). Wells and

Johnson began arguing. *Id*. Bernard then stepped out of Wells' car and shot twice at

Johnson. *Id*. Later, the jury found Bernard guilty of murder. *Id*. at (¶8). Immediately

following, the trial court set aside the jury's verdict because the trial court found that it had

erred by refusing to give a Castle Doctrine jury instruction. *Id*. A second trial commenced,

---

[8] Even though a Castle Doctrine defense has additional conditions that a defendant must meet before it can be applied, unlike a stand-your-ground instruction, both are categories of justifiable homicide defenses. Miss. Code Ann. § 97-3-15(1)(e)-(f), (3)-(4).

and a jury again found Bernard guilty of murder. *Id*. at 305 (¶13). Bernard appealed. *Id*. at

(¶13). The Mississippi Supreme Court recognized that Bernard had received both a

self-defense instruction and a Castle Doctrine instruction. *Id*. at 309-10 (¶¶31, 37). At the

second trial, the trial court had given this self-defense instruction:

> The Court instructs the jury that homicide is justified when committed in the
> lawful defense of one's own person or any other human being where there
> shall be reasonable ground to apprehend a design to commit a felony or to do
> some great personal injury, and there should be eminent danger of such design
> being accomplished.

*Id*. at (¶31).

¶83. The trial court also had given a stand-your-ground and Castle Doctrine jury

instruction:

> The Court instructs the jury that if you find from the evidence the testimony
> presented that Willie Bernard was not the initial aggressor, was not engaged
> in unlawful activity, and was in a place where he had a right to be, then Willie
> Bernard had no duty to retreat before using deadly force, and you're not
> permitted to consider Willie Bernard's failure to retreat as evidence of Willie
> Bernard's use of force in self-defense was a necessary excess or unreasonable.

*Id*.

¶84. As *Bernard* demonstrates, a defendant may be entitled to both a self-defense

instruction and a Castle Doctrine instruction. In the same vein, the Mississippi Supreme

Court has found that a defendant may request both a self-defense instruction and a

stand-your-ground instruction. *See* Maj. Op. ¶44 ("If the defendant can show that he was 'in

a place where he had the right to be and was not the immediate provoker and aggressor, he

may stand his ground without losing his right to self-defense.'") (quoting *Newell v. State*, 49

So. 3d 66, 75 (¶23) (Miss. 2010)). Therefore, if the Mississippi Supreme Court has

recognized that a defendant may raise both a self-defense instruction and a Castle Doctrine instruction in one instance, *Bernard*, 288 So. 3d at 313 (¶45), and in another instance raise a self-defense instruction and a stand-your-ground instruction, *Newell*, 49 So. 3d at 75 (¶23), nothing should prevent a defendant from raising all three defenses so long as the evidence warrants them.

## II. Ineffective-Assistance-of-Counsel Analysis

¶85. The majority analyzes whether Ford's counsel was ineffective by first distinguishing the facts of *McNeer v. State*, 307 So. 3d 508 (Miss. Ct. App. 2020)[9] from the case sub judice and then concluding that the counselor's actions were strategic. I agree that the actions of trial counsel were strategic. *See McCoy v. State*, 147 So. 3d 333, 347 (¶36) (Miss. 2014) (explaining that there is a rebuttable presumption of trial strategy as long as counselor acts within reasonable professional standards). I also agree that *McNeer* is inapplicable to this case; however, I believe that *McNeer* is inapplicable for a separate reason.

¶86. The question answered today is not the same as the question answered in *McNeer*. The question before us today is whether the trial counselor's failure to request a jury instruction equated to ineffective assistance of counsel; whereas, the question answered in *McNeer* was whether the trial court erred in refusing a jury instruction. *McNeer*, 307 So. 3d at 510 (¶1). As the majority states, *McNeer* held that "the trial court erred in unilaterally determining that McNeer was the initial aggressor thus eliminating the need for a 'stand your ground' jury instruction." Maj. Op. ¶48 (citing *McNeer*, 307 So. 3d at 516 (¶23)). Hence,

---

[9] Ford's brief asserts that the facts of *McNeer* strongly support his claim that he should have received a stand-your-ground jury instruction.

it is my view that the *McNeer* case is not applicable here because it did not address the counselor's actions.

¶87.    We should be mindful not to compare the facts addressed in "trial court error" cases with "ineffective assistance of counsel" cases because our standard of review differs between the two.  We review trial court decisions for an abuse of discretion, *Bell v. State*, 303 So. 3d 22, 26 (¶9) (Miss. Ct. App. 2020); whereas, we review ineffective-assistance-of-counsel claims de novo, *Latham v. State*, 299 So. 3d 768, 772 (¶12) (Miss. 2020), and through the lens of the two-prong test *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Thus, we should continue to make sure that we do not confuse the line of cases regarding a refusal of a jury instruction[10] with the line of cases regarding a failure to request a jury instruction.[11]

    **McDONALD, J., JOINS THIS OPINION.  McCARTY, J., JOINS THIS OPINION IN PART.**

---

[10] *McNeer v. State*, 307 So. 3d 508 (Miss. Ct. App. 2020); *Newell v. State*, 49 So. 3d 66 (Miss. 2010); *Thomas v. State*, 75 So. 3d 1112 (Miss. Ct. App. 2011); *Murphy v. State*, 566 So. 2d 1201 (Miss. 1990); *Cruz v. State*, 305 So. 3d 149 (Miss. Ct. App. 2020).

[11] *Stringer v. State*, 454 So. 2d 468 (Miss. 1984); *Blue v. State*, 674 So. 2d 1184 (Miss. 1996), *overruled on other grounds by King v. State*, 784 So. 2d 884, 889-90 (¶¶20-23) (Miss. 2001); *Smiley v. State*, 815 So. 2d 1140 (Miss. 2002); *Welch v. State*, 45 So. 3d 1231 (Miss. Ct. App. 2010); *Berry v. State*, 980 So. 2d 936 (Miss. Ct. App. 2007); *Vardaman v. State*, 966 So. 2d 885 (Miss. Ct. App. 2007); *Maxwell v. State*, 856 So. 2d 513, 515-16 (¶¶10, 14) (Miss. Ct. App. 2003) (addressing defendant's claims that both the trial court and his counsel erred by failing to request a manslaughter instruction).